IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| WILLIAM LEE and JOANNE McPARTLIN, Individually, and as Representatives of plan participants and plan beneficiaries of the VERIZON MANAGEMENT PENSION PLAN, | § § § § § | |
| Plaintiffs, | § § | |
| vs. | § § | CIVIL ACTION NO. _____ |
| VERIZON COMMUNICATIONS INC., VERIZON CORPORATE SERVICES GROUP INC., VERIZON EMPLOYEE BENEFITS COMMITTEE, VERIZON INVESTMENT MANAGEMENT CORP., VERIZON MANAGEMENT PENSION PLAN, and THE PRUDENTIAL INSURANCE COMPANY OF AMERICA, | § § § § § § § § | |
| Defendants. | § § | |

## VERIFIED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF UNDER ERISA

Plaintiffs William Lee and Joanne McPartlin, by and through their counsel, file this

Verified Complaint for Declaratory and Injunctive Relief Under ERISA and state as follows:[1]

## PRELIMINARY STATEMENT

1.   On October 17, 2012, Verizon Communications Inc. ("Verizon") filed with the

United States Securities and Exchange Commission ("SEC") a Form 8-K announcing it had

---

[1]    The material facts set forth in this Verified Complaint are supported by the sworn affidavits assembled in the Appendix filed herewith.

entered into a contract with The Prudential Insurance Company of America ("Prudential")

whereby, by the end of 2012, its Verizon Management Pension Plan would end its responsibility

to provide pensions to approximately 41,000 management retirees and Prudential would begin

providing insurance annuities to such retirees. **(App. 212)**. Verizon plans to consummate the

transaction contemplated by the contract during December 2012. **(Id.)**. Allowing it to do so,

however, will permit it to evade the dictates of the Employee Retirement Income Security Act of

1974, as amended , 29 U.S.C. §§ 1001- 1461 ("ERISA"), and the protection accorded by the

Pension Benefit Guaranty Corporation ("PBGC"), as Congress contemplated with respect to

defined benefit pension plans.

    2.    The "Press release" attached to Verizon's October 17, 2012 SEC filing

emphasizes the abdication of Verizon's responsibility under ERISA and the loss of PBGC

protection, in stating "Prudential, rather than Verizon, will be responsible for making these

monthly payments. The group annuity includes an irrevocable commitment by Prudential to

make annuity payments to affected retirees covered under the annuity contract." **(App. 216)**.

    3.    Verizon's intended course of action with Prudential, affecting approximately

41,000 pensioners, is not in compliance with standard termination procedures established under

ERISA and by the PBGC for a defined benefit pension plan and is unprecedented. Verizon, one

of the most financially successful U.S. corporations, intends to "de-risk", or abandon, its long-

term responsibility for financing and paying the pension obligations of 41,000 retirees, simply to

enhance its corporate credit rating. Verizon's motive is revealed in a standardized letter sent to

affected retirees indicating that "Prudential will assume the responsibility for your pension

benefit," so as to allow "Verizon to better focus on the core mission of providing the best communications network around the world." **(App. 220-221, 251-252)**.

4.      In shedding the pension obligations in question, Verizon is taking advantage of the group of retirees least able to defend themselves. Verizon is not engaging in the same or similar action with respect to nonmanagement retirees or those management retirees formerly represented by unions.  Retirees formerly represented by unions during employment are not included in the proposed annuity transaction. **(App. 3-4, Lee Aff. ¶ 9)**. Also not included are certain retiree participants of the Verizon Management Pension Plan formerly employed by MCI Corporation, whom Verizon is obviously concerned have rights inconsistent with Verizon's intentions. Verizon is nevertheless moving swiftly against management retirees who lack a formalized bargaining representative or other such protection.  *(Id.)*.

5.      Verizon's letter to affected retirees is executed by Marc C. Reed, who serves both as Verizon's Chief Administrative Officer and as Chairman of the Verizon Employee Benefits Committee, the named fiduciary and plan administrator of the Verizon Management Pension Plan. **(App. 221)**. The standardized letter states, in part: "Let me assure you that this decision was made after careful consideration and a thorough review of both our funding obligations <u>and what is legally permissible under the terms of the Plan</u>." (Emphasis added). *(Id.)*.  To the contrary, Verizon's proposed transaction violates the controlling terms of documents establishing and governing the Verizon Management Pension Plan, constitutes a breach of ERISA's fiduciary duty requirements, violates ERISA's prohibition on discriminatory and intentional interference with retirees' rights under a pension plan and ERISA, and undermines Congressional intent to provide American pensioners with a uniform safety net under the auspices of the PBGC.

**6.**     Plaintiffs, for themselves and on behalf of a putative class of 41,000 pension plan participants and their beneficiaries, seek temporary, preliminary and permanent injunctive relief, as well as declaratory plan-wide relief, to. avoid the loss of their rights. Each of the claims asserted in this Complaint, all under ERISA, support such relief against the defendant or defendants, and on the grounds, identified below:

| | |
|---|---|
| Count One | Verizon Employee Benefits Committee  - Violation of ERISA Section 102(b), Failure to Provide Required Disclosure in Summary Plan Descriptions; |
| Count Two | Verizon Employee Benefits Committee, Verizon Investment Management Corporation  - Violation of ERISA Section 404(a)(1), Breach of ERISA Fiduciary Duties; |
| Count Three | Verizon, Verizon Employee Benefits Committee, Verizon Investment Management Corporation  -  Violation of ERISA Section 510, Interference with Protected Rights; and |
| Count Four | Verizon, Verizon Employee Benefits Committee, Verizon Investment Management Corporation and Prudential  - Entitlement to Appropriate Equitable Relief under ERISA Section 502(a)(2) and (a)(3). |

## JURISDICTION AND VENUE

**7.**     The Court has jurisdiction of the claims for relief asserted in this Complaint based upon the civil enforcement provisions of ERISA, 29 U.S.C. §§ 1132(a)(1), 1132(a)(2), 1132(a)(3), 1132(e)(1) and 1132(f), and upon federal question jurisdiction under 28 U.S.C. §§ 1331.

**8.**     Relief is appropriate under 28 U.S.C. §§ 2201 and 2202, granting any district court of the United States, in a case of actual controversy within its jurisdiction, the power to

declare the rights and other legal relations of any interested party seeking such declaration and to grant further necessary or proper relief based upon a declaratory judgment or decree.

9.     Venue of this action lies in the Northern District of Texas, pursuant to 28 U.S.C. § 1391(b) and 29 U.S.C. § 1132(e)(2), in that the Verizon Management Pension Plan is administered in this District. The Dallas Division of this District is a convenient forum as demonstrated by Verizon Employee Benefits Committee's representations to this Court that "[r]esponsibility for day-to-day administration of the Plan. . . has been delegated by the Verizon Employee Benefits Committee to the pension administration department within the Verizon human resources department in Coppell and Irving, Texas." *Verizon Employee Benefits Committee v. Jaeger*, Not Reported in F.Supp.2d, 2006 WL 2880451 (N.D. TX September 28, 2006).

## THE PARTIES and SIGNIFICANT ENTITIES

10.     Named Plaintiff William Lee ("Lee") is a United States citizen and resident of Garland, Texas. **(App. 241, Lee Aff. ¶ 1)**. In 1997, he retired from NYNEX, a predecessor of Verizon. Within several months after his retirement date, Lee began receiving a service pension in the form of a 100% joint and survivor monthly annuity. **(App. 241, Lee Aff. ¶ 2)**.

11.     Lee is a "participant," as defined by ERISA Section 3(7), 29 U.S.C. § 1002(7), in the Verizon Management Pension Plan. **(App. 242, Lee Aff. ¶ 3)**.

12.     Named Plaintiff Joanne McPartlin ("McPartlin") is a United States citizen and resident of Venice, Florida. **(App. 246, McPartlin Aff. ¶ 1)**. In 1995, she retired from a predecessor of Verizon and began receiving a service pension in the form of a single life monthly annuity. **(App. 246-247, McPartlin Aff. ¶ 2)**.

-5-

**13.**     McPartlin is a "participant," as defined by ERISA Section 3(7), 29 U.S.C. §

1002(7), in the Verizon Management Pension Plan.  **(App. 247, McPartlin Aff. ¶ 3).**

**14.**     Defendant Verizon is a Delaware corporation doing business within this District.

Verizon maintains a human resources department charged with administering the Verizon

Management Pension Plan and various welfare benefit plans within the Dallas Division of this

District.

**15.**     Defendant Verizon Corporate Services Group Inc. is a Delaware corporation with

operations within this District, and is the plan sponsor of the Verizon Management Pension Plan.

Like Verizon, it maintains a human resources department charged with administering the Verizon

Management Pension Plan and various welfare benefit plans within the Dallas Division of this

District.  Hereinafter, both Defendant Verizon Communications Inc. and Defendant Verizon

Corporate Services Group Inc. are, together, referred to as "Verizon."

**16.**     Defendant Verizon Employee  Benefits Committee ("Verizon EBC") and/or its

chairperson is, pursuant to ERISA Sections 3(21) and 3(16), 29 U.S.C. §§ 1002(21) and

1002(16), the named "fiduciary" and "administrator" of the Verizon Management Pension Plan.

The Verizon EBC is also the named fiduciary and administrator of numerous Verizon welfare

benefit plans, and as such owes fiduciary duties to retirees who are either participants in or have

colorable claims to payment under Verizon's pension and welfare benefit plans.  The Verizon

EBC has delegated day-to-day administration of Verizon's employee benefit plans to Verizon's

human resources department, including personnel in the offices of Verizon located within this

District at 600 Hidden Ridge, Irving, Texas.  The Verizon EBC is a body appointed by Verizon,

and, as a body, performs certain designated fiduciary and administrative functions under

Verizon's employee benefit plans.  For example, as administrator and fiduciary of Verizon's

pension plans, Verizon EBC has the discretionary authority to exercise control over

disbursements of assets in the Plan.

17.    Defendant Verizon Investment Management Corporation ("VIMCO") is, pursuant

to ERISA Sections 3(21), 29 U.S.C. §§ 1002(21), a fiduciary of Verizon's several pension plans,

including the Verizon Management Pension Plan.  VIMCO exercises discretionary authority and

control respecting management and disposition of the assets of the Verizon Management Pension

Plan and Verizon's master trust, under which the assets are held, known as Bell Atlantic Master

Trust.  VIMCO is a body appointed by Verizon, and, as a body, performs certain investment

functions under Verizon's pension plans and the master trust.

18.    Defendant Verizon Management Pension Plan (the "Plan") is an "employee

pension benefit plan" pursuant to ERISA Section 3(2)(A), 29 U.S.C. § 1002(2)(A).  The Plan is a

defined benefit employee pension benefit plan.   The Plan is a "single-employer plan" and not a

"multiemployer plan."  As of the filing date of this Complaint, the Plan has approximately

100,000 participants, including Plaintiffs and the putative class of 41,000 retirees whose pension

benefits Verizon intends to involuntarily remove and terminate from the Plan. The Plan is subject

to the financial protections provided by the PBGC.

19.    Defendant Prudential is an insurance company organized and existing under the

laws of the State of New Jersey with its principal place of business in Newark, New Jersey.

Prudential is an indirect, wholly-owned subsidiary of Prudential Financial Inc., a publicly traded

corporation, which owns 10% or more of the stock of Prudential. Prudential is duly authorized to

do business in the State of Texas and does business within this District.  **(App. 266, Stone Aff. ¶**

3).  Pursuant to the contract between Verizon and Prudential, the Plan will purchase a group

annuity contract from Prudential, which will then assume responsibility for making payments to

approximately 41,000 Verizon management retirees.  Verizon and Prudential have publicly stated

that they expect to consummate the transaction in December 2012 (hereinafter the

"Verizon/Prudential annuity transaction).  (**App. 267, Stone Aff. ¶ 5**).[2]

## FACTS

**20.**     ERISA is principally concerned with protecting the financial security of pension

plan participants and beneficiaries. 29 U.S.C. § 1001(b). To this end, Congress created, in the

same year it enacted ERISA, the PBGC, a wholly-owned federal government corporation with a

three-member Board of Directors consisting of the Secretary of Labor, as Chair, and the

Secretaries of Commerce and Treasury.  The PBGC guarantees benefits under defined benefit

plans and serves as trustee for under-funded defined benefit plans that terminate. The PBGC is

also charged with administering and enforcing compliance with the provisions of Title IV of

ERISA relating to standard terminations of fully-funded plans.  The PBGC's purpose is to ensure

that retirees receive pension benefits they have earned even if their employer has terminated their

pension plan or is otherwise unwilling or unable to pay amounts due under their pension plan.

---

[2]     Plaintiffs and all putative class members are not privy to certain details of the transaction,
such as any of the analyses conducted by either Prudential and Verizon, any consultants or the so-
called 'independent fiduciary" retained by Verizon, the Verizon EBC and VIMCO, to purportedly
justify it.
         Besides highly redacting the "Definitive Purchase Agreement" which agreement affects the
pension rights of 41,000 retirees (**See generally, App. 65-210**), Verizon's stated position is that it
need not give any of the retirees the courtesy of a fully informative response to their more specific
inquiries about the subject matter, because "[t]he requested information is not required to be
provided under ERISA Section 104(b)(4)."  (**App. 14,** reflecting response to some putative class
members' list of questions sent to Verizon; (**App. 240,** list of retirees' questions asked of Verizon
senior leadership).

*Mead Corp. v. Tilley*, 490 U.S. 714, 717-18, 109 S.Ct. 2156 (1989). The PBGC has promulgated

regulations governing its activities and activities of employers administering ERISA-governed

pension funds. 29 C.F.R. § 4000, et seq. Among other things, the PBGC oversees terminations

of all ERISA plans. A pension plan may pursue a voluntary standard termination if it has

sufficient assets to pay all promised benefits. 29 U.S.C. Section 1341(b). The amount of

benefits payable in that case are determined under the plan provisions in effect on the plan's

termination date. 29 C.F.R. § 4041.8. When a pension plan covered by Title IV of ERISA

terminates without sufficient assets to pay all of its promised benefits, PBGC typically becomes

trustee of the plan and pays participants their benefits up to statutory limits. See 29 U.S.C. §§

1321-1322, 1361.[3]

21.     The PBGC's insurance program is primarily financed by premiums paid by

covered plans, including Verizon's pension plans. 29 U.S.C. § 1306(a)(1) ("[PBGC] shall

prescribe such insurance premium rates ... as may be necessary to provide sufficient revenue to

the fund for [PBGC] to carry out its functions under this subchapter."). Nevertheless, in order to

more effectively insure pensioners, the PBGC is authorized to borrow money from the United

States Treasury. ERISA Section 4005(c), 29 U.S.C. § 1305(c).

22.     The Verizon/Prudential annuity transaction will effectively eliminate all of the

---

[3]     ERISA and regulations promulgated under it contemplate only two types of defined benefit
plan terminations: (1) a "distressed termination" occurs when the PBGC decides the plan sponsor
is financially incapable of going forward with funding and administration of the plan, usually due
to bankruptcy; and (2) a "standard termination" which occurs when a fully financially capable plan
sponsor simply wishes  to voluntarily end its funding responsibilities, usually to obtain the benefit
of a surplus in funding, and the plan is ended for all persons concerned. There is no statutory concept
of a partial termination of a defined benefit plan, although some courts have treated as effectrively
terminated plans which have had significant numbers of active employees terminated from
employment and thereby terminated from their participation in the plan.

transferred retirees' ERISA protections for their pensions, including the uniform financial safety net presently provided by the PBGC. **(App. 267, Stone Aff. ¶ 6)**.

23.     Should the Verizon/Prudential annuity transaction be consummated, Plaintiffs and all other approximately 41,000 affected retirees will lose all ERISA-protected rights, including mandated annual financial disclosures and ready access to the federal courts. **(App. 268, Stone Aff. ¶ 7)**. Prudential will not be subject to ERISA's fiduciary duties standards, minimum funding standards and disclosure requirements. **(Id.)**. Prudential will not be required to disclose to any transferred retiree how his or her annuity funding is invested and who is in charge of the underlying investments. **(Id.)**.

24.     During the planning for the Verizon/Prudential annuity transaction, there was necessarily a Verizon team and a Prudential team. Both teams were comprised of senior level management officers, director level management employees, in-house lawyers, outside counsel and actuaries.

25.     Neither the Verizon team nor Prudential team had any member whose role was solely to represent Plaintiffs' and the putative class members' best interests. Throughout the planning of the Verizon/Prudential annuity transaction up to and including the October 17, 2006 public announcement date, Plaintiffs and the putative class members had no effective representation. **(App. 7, Lee Aff. ¶ 7)**.

26.     On August 24, 2012, Verizon and VIMCO entered into an engagement agreement with Fiduciary Counselors Inc.("FCI"), whereby it was appointed "independent fiduciary" and assigned the following duties:

A.     To represent the interests of the Plan and the participants and beneficiaries in

connection with the selection of the insurance company (or insurance companies) to provide an annuity, and the terms of the annuity contract or contracts, so that such selection and terms comply with the fiduciary standards, prohibited transaction restrictions, and all other applicable provisions of ERISA;

B.      To represent the interests of the Plan in the reallocation of assets within the master trust, in order to ensure that the Plan is fairly treated and receives appropriate value for any assets exchanged with other plans participating in the master trust;

C.      To deliver a written determination to VIMCO, on or about September 8, 2012, stating whether the selection of the annuity provider or providers and the terms of the annuity contract or contracts comply with the fiduciary standards, prohibited transaction restrictions, and all other applicable provisions of ERISA, and to deliver a written update of the determination to VIMCO as of the closing date of the annuity purchase, stating whether any material adverse change has occurred that would affect FCI's earlier determination;  and

D.      If requested to do so, attend meetings with the PBGC and U.S. Department of Labor jointly with VIMCO's representatives or advisers to explain the proposed transaction.  (**App. 38-39, FCI Retainer Agreement**).

27.      Verizon, VIMCO and FCI expressly agreed that FCI was not assigned either the duty to determine whether the subject matter of the parties' agreement conforms to the terms of any Plan or master trust document or the duty to give an evaluation or advise on acts, omissions or conditions regarding the Plan at any time prior to August 24, 2012. (**App. 40, ¶ D**).

28.      As a consequence of the limitation of its duty, FCI did not make any

determination whether any summary plan descriptions ("SPDs") issued by Verizon with respect to the Plan prior to August 24, 2012 complied with ERISA disclosure requirements. Likewise, FCI did not make any determination whether the contract for the Verizon/Prudential annuity transaction was contrary to the terms of Plan documents. **(App. 63-64, FCI Opinion Letter)**.

29.     When carrying out its appointed duties, FCI never communicated with any Plaintiff nor any of the putative class members. Likewise, neither Verizon, the Verizon EBC, VIMCO nor any other Plan fiduciary communicated with Plaintiffs and putative class members or solicit and obtained potentially affected retirees' input, feedback or opinions about the Verizon/Prudential annuity transaction. **(App. 243, Lee Aff. ¶ 8; App. 248, McPartlin Aff. ¶ 7; App. 263, Jones Aff. ¶¶ 10-11)**.

30.     No one associated with either Verizon or Prudential has obtained either Plaintiffs' or any putative class member's consent to be transferred out of the Plan into a Prudential annuity or any other aspect of the Verizon/Prudential annuity transaction, including its consummation. **(Id.)**.

31.     Throughout the period each Plaintiff and putative class member has been a participant in the Plan, there existed no Plan term or provision allowing Verizon to terminate retirees' rights to continued participation in the Plan and transfer the retirees' pensions into a non-ERISA regulated and non-PBGC protected annuity.

32.     Prior to the contract to the Verizon/Prudential annuity transaction, the Plan's controlling terms allowed for Plan assets to be used only for providing Plan benefits and defraying Plan expenses, not for purchasing annuities held outside the Plan. Article 8.5 of the

restated Plan[4] states, in pertinent part, ". . all Company contributions to the Pension Fund and all property of the Pension Fund, including income from investments and other sources, shall be used for the exclusive benefit of Employees, Retired Employees, former Employees, and Beneficiaries and shall be used to provide benefits under the Plan and to pay reasonable expenses of administering the Plan and the Pension Fund, except to the extent such expenses are paid by the Company." (App. 25). Article 8.5 of the restated Plan has not been amended.

33.    Prior to the contract to the Verizon/Prudential annuity transaction, the Plan's controlling terms of the Plan only allowed, in the absence of a standard termination of the Plan,[5] a transfer of pension assets into either another ERISA-regulated pension plan or trust qualified under Internal Revenue Code Section 401(a), 26 U.S.C. § 401(a). Specifically, Article 11.3 of the Plan states only states that "the Plan may be merged into or consolidated with another plan, and its assets or liabilities may be transferred to another plan." (App. 30). Article 11.3 of the restated Plan has not been amended.

34.    Prior to the contract for the Verizon/Prudential annuity transaction, the Plan's controlling terms, in the absence of a standard termination of the Plan, did not allow for the forfeiture of a retired employee's pension benefit payable under the Plan and replacement by an insurance annuity that is held outside the Plan, unregulated by ERISA and unprotected by the

---

[4]    The Plan was most recently restated at the end of year 2009. (App. 23).

[5]    At all times, the Plan has contemplated extinguishment of pension liabilities through the purchase of insurance annuities *when* a standard *termination* of the Plan *occurs*. (App. 33, Article 12.3 "Provision for Pensions After Plan Termination": (App. 33-34, Article 12.7 "Satisfaction of Liabilities on Plan Termination." However, the defendant parties' intend for the Verizon/Prudential annuity transaction to occur, for the convenience of Verizon, without the full Plan being terminated.

PBGC.

35.     The current SPD for the Plan states, in pertinent part:

**How benefits could be reduced, lost, suspended or delayed**
Your pension benefits under the plan will be reduced, lost, suspended or delayed
if one of the following conditions applies:

. . .

•  You transfer to another company as a result of a sale, spinoff or outsourcing
arrangement, and your benefit is transferred to and paid from another pension plan
maintained by such other company. (Emphasis in original). **(App. 20-22).**

The SPD, thereby contemplates the possibility of a transfer of pension benefits under the Plan to

another pension plan, but does not inform the participants that pension benefits could be

transferred out of the Plan into an insurance annuity.

36.     In order to move forward with the Verizon/Prudential annuity transaction, Verizon

has purportedly amended the Plan and inserted a new Article 8.3(b), to be effective December 7,

2012. **(App. 60-62).** The new purported Plan amendment directs the Plan to purchase one or

more annuity contracts to pay all pension benefits earned by designated retirees (i.e., Plaintiffs

and putative class members – approximately 41,000 persons who retired prior to January 1, 2010

and are receiving payment in the form of an annuity under the Plan) and, thus, extinguish the

designated participants' rights to pension benefits payable under the Plan and extinguish the

Plan's obligation to make pension payments to the designated retirees. (*Id.*).

37.     The new purported Plan amendment, Article 8.3(b), creates an ambiguity

concerning the authority under the Plan for the Verizon/Prudential annuity transaction because it

conflicts with Articles 8.5, 11.3, 12.3 and 12.7 and the aforesaid limited disclosures made in the

SPDs issued to Plaintiffs and putative class members prior to August 24, 2012.

38.     The latest Internal Revenue Service ("IRS") Form 5500 executed by the Plan

administrator and filed with the IRS and US Department of Labor during October 2012 reports

on line 6b that at the end of year 2011 there were 47,115 "Retired or separated participants

receiving benefits".  **(App. 50)**.

39.     The Verizon/Prudential annuity transaction will involve a significant reduction in

the Plan's total number of pension-eligible participants.  The result of dividing the total number

of involuntarily terminated Plan participants (approximately 41,000) by the total number of Plan

participants (approximately 100,000) meets, unquestionably, the "significant percentage test"

federal courts have uniformly applied when determining whether a "partial termination" of a

pension plan has occurred.  The Court should declare that the Verizon/Prudential annuity

transaction will result in a partial termination of the Plan and, accordingly, enforce the Plan's

controlling terms applicable when a partial termination occurs.

40.     Prior to the Verizon/Prudential annuity transaction, the Plan's controlling terms in

Article 12.1 provided that "[i]n case of a termination or partial termination of the Plan, the rights

of all affected Employees, Retired Employees, and Beneficiaries to benefits accrued under the

Plan to the date of such termination or partial termination, to the extent then funded, shall be

nonforfeitable." The current SPD for the Plan states, in pertinent part:

### *Changes in the plan*

. . .
Upon termination or partial termination of the plan, the accrued benefits of each
participant affected by the termination or partial termination (as determined by the
plan administrator) shall become fully vested to the extent funded. (Emphasis in
original). **(App. 17)**.

Since Verizon recognizes the necessity of full vesting of benefits in the case of even a partial

termination of the Plan, Verizon should give those retirees affected by the Verizon/Prudential

annuity transaction the option of taking a lump sum payment directly from the Plan.

41.     Presently, Plaintiffs and all potential class members have Plan benefits that are insured or guaranteed by the PBGC up to a monthly limit of $4,353.41, or approximately $55,800 per year per retiree who is at least age 65 years, and that annual protection is for an unlimited number of consecutive years. The protected annual rate is higher for retirees over age 65.[6]

42.     The Verizon/Prudential annuity transaction places the affected retirees in an inferior safety-net, not governed by a uniform federal law, but governed by non-uniform laws relating to insurance guaranty associations of 50 separate states. All fifty states and two territories have a guaranty association that is supposed to protect policyholders in the event that a life insurance company becomes insolvent or impaired. **(App. 268, Stone Aff. ¶ 8).**

43.     State guaranty association relief varies from state to state and benefits are not provided in a uniform fashion. Most state guaranty associations categorize annuity policies as either "allocated" or "unallocated" with significantly greater protection for allocated policies. Allocated contracts provide benefits directly to individuals with the coverage limits as set forth below. Unallocated contracts are held by the corporate employer or retirement plan trustees and the "policyholder" is considered to be the group. Guaranty fund limits for unallocated group policies generally range from $1 million to $5 million in total and the determination of which contracts are allocated versus unallocated varies from state to state and courts have not definitively or uniformly determined how these concepts apply. **(App. 268, Stone Aff. ¶ 9).**

---

[6]   The PBGC's maximum benefit guarantee is set each year under provisions of ERISA. The PBGC posts at its website its maximum monthly guarantee tables: http://www.pbgc.gov/wr/benefits/guaranteed-benefits/maximum-guarantee.html#2012

44. A description placed on the Prudential website simply says "the Verizon Management Pension Plan will purchase a group annuity contract from Prudential." Additionally, the sample redacted form of group annuity contract attached to the heavily redacted Definitive Purchase Agreement makes it difficult if not impossible to determine what type and how much guaranty association coverage would apply to the 41,000 retirees in the event Prudential became insolvent or impaired. **(App. 268-69, Stone Aff. ¶ 10)**.

45. Assuming that the Prudential annuity falls into the category of an allocated contract allowing for individual coverage, as opposed to a group limited amount of lump sum coverage allowed for an unallocated contract, once Plaintiffs' and the other affected retirees' pension benefit is removed from the Plan and transferred by Verizon to Prudential, each retiree will lose all federal protection through the PBGC, to be replaced, in the event of the inability of Prudential to make payments to them, by the following insufficient and varying insurance guaranty coverage amounts determined by the retirees' respective states of residence, as follows:

- Eight states and one territory – AK, AZ, IN, MA, MS, MO, NH, NV and Puerto Rico – limit coverage for annuity holders in case of a default or shortfall to a lifetime maximum of $100,000;

- Twenty eight states – CA, CO, DE, HI, ID, IL, IA, KS, KY, LA, ME, MD, MI, MN, MT, NE, NM, ND, OH, RI, SD, TN, TX, UT, VT, VA, WV, WY – limit coverage for annuity holders in case of a default or shortfall to a lifetime maximum of $250,000;

- Ten states – AL, AR, FL, GA, NC, OK, OR, PA, SC, WI and the District of Columbia – limit coverage for annuity holders in case of a default or shortfall to a lifetime maximum of $300,000; and

- Four states – CT, NJ, NY and WA – limit coverage for annuity holders in

case of a default or shortfall to a lifetime maximum of $500,000.[7] **(App. 269-70, Stone ¶ 11).**

46.     Individual coverage limits under state guaranty statutes vary from $100,000 to $500,000 per person and are generally determined by the state of residency at the time of impairment or insolvency of an insurance company. **(App. 270, Stone Aff. ¶ 12).**  Most state guaranty associations are underfunded or unfunded, relying on future premium assessments to fund unknown liabilities. **(Id.).**  State guaranty association coverage amounts and rules of the game can be subject to change without notice. **(App. 270, Stone Aff. ¶ 14).**  Relocating retirees may unwittingly divest themselves of guaranty association coverage.  For example, an annuitant living in Connecticut with $500,000 of potential coverage, after relocating residence to Arizona, could find himself or herself with just $100,000 of coverage. [8] **(App. 270, Stone Aff. ¶ 15).**

47.     In addition to the patchwork nature of state guaranty funds, putative class members who already hold a Prudential annuity may be further damaged by the Verizon/Prudential annuity transaction as coverage amounts are per person, not per policy. **(App. 270, Stone Aff. ¶ 13).**

48.     Retirees and their spouses, especially those who reside in states with the lowest protection levels, will be seriously harmed and left with as little as two years pension benefit replacement in case of default by Prudential on its annuity obligation. **(App. 271, Stone Aff. ¶ 17).**

---

[7]     If the annuity to be issued pursuant to the Verizon/Prudential annuity transaction is regarded as unallocated, the coverage amounts may be even more limited in certain states.

[8]     The annuitant "must rely primarily (if not exclusively) on state-contract remedies if they do not receive proper payments or are otherwise denied access to their funds." *Beck v. PACE Intern. Union,* 551 U.S. 96, 106, 127 S.Ct. 2310, 2318 (2007).

49.    Moreover, state guaranty funds have been known to assert their subrogation rights as priority claims and net out coverage amounts against remaining estate assets.  This means that the actual dollar amount of benefits funded out of the individual state guaranty association coffers themselves are invariably less than the fund limits they promote.  **(App. 270-271, Stone Aff. ¶ 16)**.

50.    Should the Verizon/Prudential annuity transaction be consummated, Prudential could choose to re-sell or transfer to another unknown insurance company all or part of its annuity responsibilities for the Plaintiffs and the putative class of transferred retirees, further diluting and eviscerating the present ERISA-regulated and PBGC-insured rights of Plaintiffs and putative class members.

51.    Should the Verizon/Prudential annuity transaction be consummated, Plaintiffs and all other approximately 41,000 retirees will lose all ERISA protected rights, including mandated annual financial disclosures and ready access to the federal courts.  Prudential will not be subject to ERISA's fiduciary duties standards, minimum funding standards and disclosure requirements.  Basic data regarding the funded status of a pension annuity, changes in assets and liabilities, and the amount that annuitants would stand to lose if an underfunded annuity was terminated are vitally important to retirees.  Prudential will not be required to disclose to any transferred retiree how his or her annuity funding is invested and who is in charge of the underlying investments, as Verizon is required to do with respect to the Plan. **(App. 268, Stone Aff. ¶ 7)**.

52.    Should the Verizon/Prudential annuity transaction be consummated, the public policies expressed by Congress and set forth within ERISA will be thwarted.  Short of a standard termination of the Plan approved by the PBGC, ERISA simply does not permit a transfer of

Verizon's pension payment obligations to Plaintiffs and the putative class of retirees to an insurance company, and the consequential canceling of Verizon's obligation to pay PBGC required annual premium payments on account of such participants.  Should the Verizon/Prudential annuity transaction be consummated, the PBGC's overall mission will be impaired.  A very wealthy, solid Fortune 5 U.S. corporation will no longer annually contribute millions of dollars in premiums to the PBGC, as needed by the PBGC in order to protect the financial security of numerous other U.S. employer defined benefit pension plans.[9]

53.     The contemplated Verizon/Prudential annuity transaction, if allowed to proceed, could very well lead to a series of copycat transactions that unravel long-range Congressional intent when enacting ERISA and establishing the PBGC.  If numerous corporate sponsors of well-managed defined pension benefit plans engage in the same sort of de-risking scheme and hand over their pensioners to insurance annuity providers, the situation could lead to the PBGC holding all of the potential liability for much financially weaker under-funded defined benefit pension plans.  The Verizon/Prudential annuity transaction thereby threatens the long term financial solvency of the PBGC insurance program, requires other sponsors that have acted financially responsibly to pay higher PBGC premiums, and potentially could lead to the PBGC's call for a rescue of the entire program with taxpayer funds. Indeed, a number of factors – a current requirement of disclosure to the SEC of the status of funding of pensions, increased longevity of retirees and recent declines in interest rates and other rates of return – are

---

[9]     For each of the 41,000 management participants Verizon plans to remove from the Plan by the end of 2012, Verizon will avoid an obligation to make a $42 payment to the PBGC on February 28, 2013. Thus, beginning in 2013, the PBGC's total loss of recurring annual premium revenues from Verizon will be $1,722,000.00.

increasingly leading sponsors of pension plans to consider not only mitigating so-called "pension risk," but transferring risk, as in the case of the Verizon/Prudential annuity transaction. When an employer transfers pension risk by using plan assets to remove plan participants and relegate them to a group annuity, it is not only depriving retirees of the protections of ERISA and the PBGC, it is foregoing other alternatives which might be equally acceptable to retirees without so offending ERISA. These include offering lump-sum payments to participants or purchasing a group annuity as an asset of the plan. Allowing the Verizon/Prudential annuity transaction to proceed in the face of the evisceration of ERISA it represents and the lack of such alternatives to the affected management retirees – much less the violation of the Plan it involves – would thereby accelerate an already worrisome trend.

54.     The Verizon/Prudential annuity transaction is not what the Plaintiffs and the putative class of management retirees bargained for when they loyally served Verizon and predecessor companies, including the business entities comprising the former old Bell System. The contemplated involuntary removal of Plaintiffs and the putative class of retirees from the Plan and their transfer to Prudential's control is not in Plaintiffs' and putative class members' best long-term financial interests and Plaintiffs do not consent to this change. **(App. 243, Lee Aff. ¶ 8;  App. 248, McPartlin Aff. ¶ 7;  App. 263, Jones Aff. ¶¶ 10-11).[10]**

---

[10]     As of the end of year 2011, Prudential formally disclosed in its annual statement that it had approximately $246.8 billion in assets with an estimated $238.6 billion in liabilities, revealing it, then, had a surplus of approximately $8 billion overall, or a less than a 4% financial cushion. In the same annual statement, Prudential reported $7.7 billion in investments tied to other ("non-agency") mortgage-backed securities and a combined concentration in affiliated debt or equity investments of $8.9 billion and more than $15 billion in exposure to commercial mortgages. In addition, in Note 11B to its 2011 annual statement to state insurance commissioners, Prudential reported $2.8 billion in assets pledged to the Federal Home Loan Bank of New York, of which $0.9 billion is reflected as borrowed money.  Finally, on Schedule S, Part 3, Section 1 of the same annual statement,

55.    Neither the Plan nor the Verizon EBC recognize a class-wide administrative claim internally submitted as a benefit claim or to obtain redress of any other kind. The Plan has no administrative procedure or effective available remedy so as to provide Plaintiffs and putative class members the plan-wide relief requested in this Complaint and necessary to protect their interests.  Any internal claim to pursue class-wide relief for violation of terms of the Plan or the fiduciary duty of the Verizon defendants with respect to the Plan is futile, a meaningless exercise, as Verizon and the Verizon EBC have committed themselves to a course of action incompatible with Plaintiffs' and putative class members' best interests.

**FIRST CLAIM FOR RELIEF**
**(Against Verizon EBC for Breach of Fiduciary Duty**
**Due to Failure to Make Disclosure in Pension Plan SPDs)**

56.    Plaintiffs incorporate and reallege by reference the foregoing paragraphs 1 through 55, inclusive, as if they were fully set forth herein.

57.    ERISA Section 502(a)(3), 29 U.S.C. § 1132(a)(3), authorizes a civil action "by a participant, beneficiary, or fiduciary (A) to enjoin any act or practice which violates any provision of this subchapter or the terms of the plan, or (B) to obtain other appropriate equitable relief (i) to redress such violations or (ii) to enforce any provisions of this subchapter or the terms of the plan."

58.    ERISA Section 102(b) requires, in part, that a pension plan administrator provide

---

Prudential records a "reserve credit" for liabilities transferred to a 100% owned captive insurance company known as Prudential NJ Captive Insurance Company.  (**App. 266-67, Stone Aff. ¶ 4**). In light of these multiple disclosed risks, Prudential's ability to withstand a liquidity crisis or another economic downturn is not at all certain. A Prudential insolvency could create major disruptions in payments flowing to the retirees.

each plan participant with an SPD which describes the "circumstances which may result in disqualification, ineligibility, or denial or loss of benefits." 29 U.S.C. § 102(b). U.S. Department of Labor regulations require, in part, that an SPD contain a statement clearly identifying circumstances which may result in disqualification, ineligibility, or denial, loss, forfeiture, suspension, offset, reductio or recovery. . . of any benefits that a participant or beneficiary might otherwise reasonably expect the plan to provide on the basis of the description of benefits. . . 29 C.F.R. § 2520.102-3-(*l*).

59.    An SPD is considered essential in informing employees and retirees of their rights, seasonable expectations and obligations under a pension plan.

60.    Verizon EBC has issued numerous SPDs with respect to the Plan, all of which have consistently failed to meet ERISA's requirement to disclose all circumstances that may result in Plaintiffs' and putative class members' ineligibility for or loss of benefits provided by the Plan.

61.    While Verizon's SPDs with respect to the Plan have contained a standard reservation of rights clause ("ROR") which allows for changes to be made to the Plan and permits a standard termination of the Plan, such ROR does not fulfill either the general statutory requirements of ERISA Section 102(b) or the more specific requirements of 29 C.F.R. § 2510.102-3-(*l*).

62.    In none of the SPDs issued to Plaintiffs and putative class members by the Plan administrators is there any discussion, disclosure or notice that either a single retiree or large group of retirees with vested rights could be involuntarily removed from enrollment in the Plan and transferred to either Prudential or any other insurance company and, thereby, made ineligible

for continued receipt of pension benefits under the Plan.

63.     The failure to provide Plaintiffs and putative class members with an SPD containing a disclosure about the possible removal from the Plan of certain retirees, and in fact, discrimination against such retirees by comparison with other Plan participants, by termination of their pension participation in the Plan and purchase of replacement annuities issued by an insurance company, is a statutory violation of ERISA Section 102 (b) subject to remedy under ERISA Section 502(a)(3) and breach of fiduciary duty subject to remedy under ERISA Section 502(a)(2). "The duty to disclose material information is the core of a fiduciary's responsibility, animating the common law of trusts long before the enactment of ERISA." *Eddy v. Colonial Life Ins. Co. of Am.*, 919 F.2d 747, 750 (D.C. Cir. 1990). Verizon EBC, as Plan administrator, has been obligated to provide each Plaintiff and each putative class member with such disclosure without any request being made by anyone.  Since there has been no such disclosure, the SPDs given to Plaintiffs and putative class members "ha[ve] the effect of failing to inform" the retirees of a key limitation on their right to recover benefits under the Plan, a violation of 29 C.F.R. § 2520.102–3(b).

64.     All of the SPDs issued to Plaintiffs and putative class members have fallen short of the high standards of clarity and completeness to which SPDs are held and have been inadequate.

65.     No average Plan participant would understand from reading any SPDs that he or she could be abandoned by Verizon, removed from the Plan which is protected by ERISA and the PBGC, and transferred to either Prudential or another insurance company and, thereby, forever lose all protections provided by ERISA and the PBGC.

**66.** Verizon has no basis to contend the SPDs are the products of an innocent mistake or omission.

**67.** No Plan documents contain any terms that authorize the involuntary removal of retirees from continued participation in the Plan. The contract providing for the Verizon/Prudential annuity transaction is not a Plan amendment.

**68.** While the Plan permits itself to be merged into or consolidated with another Internal Revenue Code qualified pension plan, and its assets or liabilities may be transferred to another qualified pension plan, there is no term, rule or directive that allows retired Plan participants, as opposed to assets or liabilities, to be removed from the Plan and transferred without his or her knowledge and consent. There are no terms in the Plan documents allowing either the Plan sponsor or Plan administrator to segregate and allocate vested pensioners to an insurance company.

**69.** Since Plaintiffs and putative class members have not known about the possibility that Verizon could someday, in the absence of a standard termination of the Plan, end the retirees' participation in the Plan and their ERISA and PBGC protections, each has been harmed and each has lost the opportunity to be fully informed and take timely appropriate action so as to attempt to obtain a Plan amendment, or take other organized and, perhaps, legal steps, so as to obtain an enforceable commitment by defendants not to take such action against affected retirees. *CIGNA Corp. v. Amara*, 536 U.S. __, 131 S.Ct. 1866, 1881 (2011). **(App. 242-43, Lee Aff. ¶ 5; App. 247-48, McPartlin Aff. ¶ 5; App. 262, Jones Aff. ¶ 7).**

**70.** There is no provision of ERISA dictating specific relief for violation of ERISA Section 102(b). Therefore, nothing precludes equitable relief for violation of Section 102 (b).

Since the SPDs issued to Plaintiffs and putative class members prior to the defendants' contract for the Verizon/Prudential annuity transaction have not satisfied ERISA's disclosure requirements, the Court should estop the defendants from exercising undisclosed rights. More specifically, this Court should estop the defendants from removing Plaintiffs and putative class members from the Plan and transferring them to a Prudential group annuity. The Court should further estop defendants from enacting and carrying out any *ad hoc* or *post hoc* Plan amendment, including the purported amendment to Article 8.3 of the Plan, to enable consummation of the Verizon/Prudential annuity transaction.

71.     Pursuant to ERISA Section 502(a)(3), 29 U.S.C. § 1132(a)(3), Plaintiffs ask this Court to grant appropriate class-wide equitable relief, including a declaration that Verizon EBC violated ERISA Section 102(b), 29 U.S.C. § 1022(b) and DOL Regulation 29 C.F.R. § 2520.102-3-(*l*) by failing to make disclosure in any SPD issued to Plaintiffs and putative class members with respect to the Plan that Verizon could remove the retirees from the Plan and involuntarily make them annuitants of a Prudential annuity not regulated by ERISA and not protected by the federal uniform PBGC guarantee regime. Plaintiffs ask this Court to grant injunctive relief ordering maintenance of the status quo, being the continued participation of Plaintiffs and all putative class members in the Plan. In the alternative, in order to provide other appropriate equitable relief, the Court should order defendants to provide Plaintiffs and each putative class member an elective choice of either: (1) keeping his pension benefit in the Plan; (2) receiving a lump sum distribution of Plan pension benefits; or (3) selecting Prudential or some other issuer of an annuity equivalent to his or her existing Plan benefits.

## SECOND CLAIM FOR RELIEF
### (Against Verizon EBC and VIMCO For Breach of Fiduciary Duty, Including Failure to Comply with Plan Document Rules)

**72.**     Plaintiffs incorporate and reallege by reference the foregoing paragraphs 1 through 71, inclusive, as if they were fully set forth herein.

**73.**     One of ERISA's cardinal duties imposed on pension plan administrators is that they must act in strict conformity with existing plan terms and rules, to the extent the plan's terms and rules are not inconsistent with ERISA.

**74.**     The planned transfer of Plaintiffs and putative class members out of the Plan into a Prudential annuity is being conducted with the intent by Verizon and the Verizon EBC to evade a standard termination of the Plan, the only process allowed by the Plan's controlling terms so as to immediately end Plan participation by the group of 41,000 retirees.  A standard termination of the Plan requires regulatory approval by both the PBGC and the Internal Revenue Service, which dual federal agency oversight is being avoided by both Verizon and the Verizon EBC through the Verizon/Prudential annuity transaction.

**75.**     If purchasing an annuity as part of a standard termination of the Plan, Verizon and the Verizon EBC would be required to provide each Plaintiff and putative class member at least 60 days before the proposed termination date an informative notice of intent to terminate the Plan with annuity information in advance of the annuity purchase. 29 CFR § 4041.23 and 29 CFR § 4041.27  These notice requirements are being avoided by Verizon and the Verizon EBC through the Verizon/Prudential annuity transaction. .

**76.**     The planned transfer of Plaintiffs and putative class members out of the Plan and into a Prudential annuity is action not in accordance with controlling Plan terms and rules.

*Kennedy v. Plan Administrator for DuPont Savings and Investment*, 555 U.S. 285, 129 S.Ct. 865 (2009) (ERISA provides no exception to the plan administrator's duty to act in accordance with existing plan documents and stated rules).

77.     The Plan contains provisions contemplating there could be mergers, consolidations of pension plans, and transfers of "assets" or "liabilities" to another Internal Revenue Code Section 401(a) qualified pension plan protected by the PBGC.  None of the terms of the Plan authorizes the involuntary transfer of retirees' pensions out of the Plan to be replaced by an insurance annuity.  Likewise, the Plan does not contain a ROR that allows Verizon, in the absence of a standard termination of the Plan, to involuntarily extinguish Plaintiff's and putative class members' ERISA rights and PBGC protection.

78.     Article 11.2 of the restated Plan states, in part, "no amendment shall reduce any benefit, that is accrued or treated as accrued under section 411(d)(6) of the [Internal Revenue] Code, of any participant, or the percentage (if any) of such benefit that is vested, on the later of the date on which the amendment is adopted or the date on which the amendment becomes effective."

79.     By allowing Plaintiffs' and putative class members' rights to receive payment of accrued pension benefits paid directly from the Plan to be reduced to zero through the Verizon/Prudential annuity transaction, the Verizon EBC's conduct violates the terms of Article 11.2 of the Plan.

80.     The Verizon EBC's and VIMCO's participation in and consent to the transfer of Plaintiffs' and putative class members' pensions out of the Plan, while maintaining the Plan's coverage for over 50,000 other Plan participants, is discriminatory action taken in violation of

Plaintiffs' and putative class members' rights under the Plan and ERISA.

81.     Throughout the planning for the Verizon/Prudential annuity transaction, the Verizon EBC, VIMCO and other Plan fiduciaries and Plan administrators have continued to owe all Plaintiffs and putative class members the highest duty of care.

82.     The inclusion of Plaintiffs and putative class members in the Verizon/Prudential annuity transaction is not a Plan design function. Instead, the inclusion of Plaintiffs and putative class members in the Verizon/Prudential annuity transaction is an exercise of a fiduciary function carried out by Plan administrators.

83.     As the designated plan administrator and fiduciary, the Verizon EBC cannot discriminate and accord different or special treatment to one group of retirees.  However, the contemplated Verizon/Prudential annuity transaction will result in one group of retirees – pre-January 1, 2010 management retirees not represented by a union and not otherwise entitled to protection against the transaction as former MCI employees – losing all Plan provided pension benefits and ERISA protections and the financial security provided by the PBGC and result in another group of retirees – non-management retirees,  pre-January 1, 2010 formerly represented management employees and former MCI employees and post-January 1, 2010 management retirees – maintaining all Plan pension benefits and ERISA and PBGC protections.   Such non-uniform treatment of retirees is a breach by the Verizon EBC of its ERISA duty of loyalty to Plaintiffs and all putative class members.

84.     The failure on the part of  Verizon EBC and VIMCO in the exercise of their fiduciary duty to even inquire whether Plaintiffs and putative class members are willing to have the Plan transfer its obligation for their pensions to Prudential, or prefer to have their pension

entitlements paid directly to them or to tax-qualified accounts they have established in a lump sum, is also a breach of their ERISA duty of loyalty to Plaintiffs and putative class members given the stringency of their fiduciary duty under ERISA.

85.    The decision by the Verizon EBC and VIMCO either directly or indirectly, by reliance upon FCI as an independent fiduciary proxy, to either allow, or participate in Verizon's selection of, Prudential as the lone insurer to issue an annuity subjects Plaintiffs and all putative class members to the risk of a single insurer undergoing some future unexpected and catastrophic event that could place many retirees and their beneficiaries in potential financial ruinous circumstances.  Verizon's annuity transaction with Prudential is one of the largest in U.S. history. Verizon's and Verizon EBC's decision to shirk their responsibility for Plan funding necessary to support 41,000 management retirees and place all of that funding responsibility under the auspices of a single insurer runs counter to ERISA's cardinal charge that fiduciaries "diversify[] the investments of the plan so as to minimize the risk of large losses." ERISA Section 404(a)(1)(C), 29 U.S.C. § 1104(a)(1)(C).[11]  Prudential is not too big to fail.  If the current economic situation has taught retirees anything, it is that the funded status of a behemoth insurer can change in an instant and cause devastating economic harm for the whole country.

86.    Soon after Verizon publicly announced the Verizon/Prudential annuity

---

[11]    The Verizon/Prudential annuity transaction is not one to facilitate the standard termination of a pension plan. Therefore, Plaintiffs contend that the ERISA Section 404(a)(1)(C) statutory fiduciary standard is applicable, and this case presents a situation highly distinguishable from that situation addressed in *Bussian v. RJR Nabisco, Inc.*, 223 F.3d 286, 294 (5th Cir. 2000), where the appellate court noted that RJR's purchase of insurance annuities did not implicate the statute because the purchase was made to facilitate a standard termination of RJR's vastly over-funded defined benefit pension plan. Here, on the other hand, where the Plan remains in existence for over half of the existing participants, the Verizon/Prudential annuity transaction does represent a use of Plan assets subject to scrutiny under  ERISA Section 404(a)(1)(C).

transaction, Moody's Investors Service Inc., a highly regarded insurance rating agency, stated in a credit outlook report that the Verizon/Prudential annuity transaction is "credit negative" for Prudential because the transaction:

> increases the insurer's risk concentrations, further exposing it to the challenges of estimating longevity risk, managing a long-duration portfolio and investing any portion of the proceeds not provided through existing investments in a low-yield environment. In addition, we believe that the transaction artificially boosts the company's regulatory capital by reducing the amount of minimum required reserves. **(App. 218)**.

Moody's stated that the transaction also is credit negative because it represents more than 5% of Prudential's general account holdings. (*Id.*). The report, published on October 22, 2012, thereby implies that either Prudential is more likely to default, or it has fewer assets than is desirable if it does default. This does not give Plaintiffs and putative class members any, much less be required, level of comfort about the Verizon/Prudential annuity transaction, considering the fiduciary duty of defendants other than Prudential.

87. Verizon EBC and VIMCO have each violated ERISA Section 404(a)(1), which provision mandates that fiduciaries discharge their "duties with respect to a plan solely in the interest of the participants and beneficiaries and– for (A) for the exclusive purpose of: (i) providing benefits to participants and their beneficiaries; . . . (B) with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims; (C) by diversifying the investments of the plan so as to minimize the risk of large loses, unless under the circumstances it is clearly prudent not to do so; and (D) in accordance with the documents and instruments governing the plan. . ." 29 U.S.C. § 1104(a)(1).

88. Pursuant to ERISA Section 502(a)(3), 29 U.S.C. § 1132(a)(3), Plaintiffs ask this

Court to grant appropriate class-wide equitable relief, including a declaration that the Verizon EBC and VIMCO each failed to meet and breached its statutory fiduciary duty under ERISA Section 404(a)(1), 29 U.S.C. § 1104(a)(1), and grant Plaintiffs and putative class members temporary, preliminary and permanent injunctive and other appropriate equitable relief.

## THIRD CLAIM FOR RELIEF
### (ERISA Section 510 Claim Against Verizon, the Verizon EBC and VIMCO)

89.   Plaintiffs incorporate and reallege by reference the foregoing paragraphs 1 through 88, inclusive, as if they were fully set forth herein.

90.   ERISA Section 510, "Interference with Protected Rights," reads in pertinent part: "It shall be unlawful for any person to discharge, fine, suspend, *expel*, discipline, or *discriminate* against a participant or beneficiary. . . for the purpose of interfering with the attainment of any right to which such participant my become entitled under the plan, for exercising any right to which he is entitled to under the provisions of an employee benefit plan, this title or Welfare and Pension Plans Disclosure Act." (Emphasis added). 29 U.S.C. § 1140.

91.   By choosing to remove from the Plan the pensions of approximately 41,000 retirees and entering into the Verizon/Prudential annuity transaction without there being a standard termination of the Plan, Verizon, the Verizon EBC and VIMCO had and continue to have the specific intent to violate ERISA, to discriminate against and expel Plaintiffs and the putative class of retirees from ongoing participation in the Plan and interfere with retirees' rights and protections accorded by the terms of the Plan and ERISA. Verizon, the Verizon EBC and VIMCO have accordingly violated ERISA Section 510, 29 U.S.C. § 1140.

92.   Among other Plan rights that the Verizon/Prudential annuity transaction interferes

with are Plaintiffs' and putative class members' rights to continued participation in the Plan until such time as their respective vested pension benefits are paid in full.   The current SPD for the Plan states, in pertinent part:

> ### When participation ends
> You are a plan participant as long as you have a vested benefit [i.e. accrued] in the plan that has not been paid to you in full. (Emphasis in original). **(App. 19)**.

Clearly, the SPD reflects that, until all pension benefits are received by the retiree, he or she will continue participating in the Plan. Without their consent and in violation of the Plan, Plaintiffs' and putative class members' rights to receive a full distribution of their respective vested pension benefits are being defeated.

**93.**   On October 17, 2012, the Verizon Board of Directors passed a resolution expressing the Board's intent that, "after the annuity purchase, individuals who receive annuity certificates shall no longer be participants in or beneficiaries of the Plan under the Department of Labor's regulation at 29 C.F.R. § 2510.3-3(d)(2)(ii) with respect to their pension benefits, and the Plan shall have no further obligation to make any payment with respect to any pension benefit of a Designated Participant, including with respect to any survivor, alternate payee, beneficiary, or other person claiming by or through the Designated Participant." **(App. 55)**.

**94.**   Verizon explains in a "Q&A" accompanying the letter mailed to affected pensioners regarding the Verizon/Prudential annuity transaction that, while their pension participation rights in the Plan are to be ended, "If you qualify for the Pensioner Death Benefit, your eligible beneficiaries will receive this benefit from the Verizon Management Pension Plan (subject to the terms of the Plan)." **(App. 257, ¶ 8)**.

**95.**   Pursuant to ERISA Section 502(a)(3), 29 U.S.C. § 1132(a)(3), Plaintiffs ask this

Court to grant appropriate class-wide equitable relief, including a declaration that the conduct by Verizon, the Verizon EBC and VIMCO violates ERISA Section 510, 29 U.S.C. § 1410, and grant Plaintiffs and putative class members temporary, preliminary and permanent injunctive and other appropriate equitable relief.

## FOURTH CLAIM FOR RELIEF
### (ERISA Sections 502(a)(2) and (a)(3) Claim for Appropriate Equitable Relief Against Verizon, Verizon EBC, VIMCO and Prudential)

**96.** Plaintiffs incorporate and reallege by reference the foregoing paragraphs 1 through 95, inclusive, as if they were fully set forth herein.

**97.** The Fifth Circuit has observed and ruled that there is no limitation on the set of proper defendants to an ERISA Section 502(a)(3) action. *Bombardier Aerospace Employee Welfare Benefits Plan v. Ferrer, Poirot & Wansbrough*, 354 F.3d 348, 354 (5th Cir. 2003), *cert. denied*, 541 U.S. 1072, 124 S.Ct. 2412 (2004). In view of the defendants' contract for the Verizon/Prudential annuity transaction, each defendant must concede it is a proper defendant party. Each defendant is needed to effectuate an order either maintaining the status quo or giving the Plaintiffs and each putative class member an elective choice of either: (1) keeping his pension benefit in the Plan; (2) receiving a lump sum distribution of Plan <u>pension</u> benefits; or (3) selecting Prudential or some other another insurance issuer of an annuity equivalent to his or her existing Plan benefits.

**98.** Verizon, the Verizon EBC, VIMCO and Prudential should maintain the status quo and not carry out the contemplated removal of 41,000 retirees from the Plan. But no defendant will take such action absent a directive and order issued by the Court.

**99.** Plaintiffs accordingly request, pursuant to ERISA Sections 502(a)(2) and (a)(3),

29 U.S.C. §§ 1132(a)(2) and (a)(3), appropriate equitable relief, including temporary, preliminary and permanent injunctive relief ordering the defendants to maintain the status quo and not remove Plaintiffs and putative class members from continued participation in the Plan. In the alternative, Plaintiffs request an order requiring defendants to give Plaintiffs and each putative class member an elective choice of either: (1) keeping his pension benefit in the Plan; (2) receiving a lump sum distribution of Plan <u>pension</u> benefits; or (3) selecting Prudential or some other issuer of an annuity equivalent to his or her existing pension benefits provided under the Plan.

<b>CLASS ACTION ALLEGATIONS</b>

     **100.**   <u>**Class Definition**</u>. Plaintiffs bring this action on behalf of:

> All retirees, plan participants and their beneficiaries of the Verizon Management Pension Plan (approximately 41,000 persons) with respect to whom Verizon and Prudential have reached agreement to have the retirees' pensions removed from the Plan and be issued annuities by The Prudential Insurance Company of America.

The putative class is easily identifiable by both Verizon's business records and Prudential's business records.

     **101.**   This action is maintainable as a class action under Federal Rule of Civil Procedure Rule 23, subsections (a), (b)(2), and (b)(3).

     **102.**   <u>**Class Size**</u>. The size of the putative class is approximately 41,000 persons. The putative class is so numerous that joinder of all the members of the putative class is impractical.

     **103.**   <u>**Questions of Law and Fact Common to the Class**</u>. This suit poses questions of law and fact which are common to and affect the rights of all putative class members. The questions presented include, but are not limited to: (A) whether defendants have provided adequate disclosure of the possibility of a transaction such as the Verizon/Prudential annuity

transaction, (B) whether the Verizon/Prudential annuity transaction violates the terms of the Plan, (C) whether Plan administrators and fiduciaries violated their fiduciary duties under ERISA Section 404(a)(1), (D) whether certain parties to the Verizon/Prudential annuity transaction have violated ERISA Section 510, and (E) whether Plaintiffs and other retired plan participants and their beneficiaries are entitled to declaratory and injunctive relief, pursuant to ERISA Section 502(a)(3), and the form and extent of the relief to which they should receive.

104.  **Typicality of the Claims of the Representatives**.  Plaintiffs' claims are typical of the claims of the putative class as a whole.

105.  **Adequacy of Representation**.  Plaintiffs have no interest antagonistic to or in conflict with the interests of the putative class.  Indeed, Plaintiffs have the support of thousands of putative class members.

106.  Plaintiffs' counsel are experienced counsel who have served as class counsel in ERISA cases, collective actions and other complicated employment law cases successfully litigated and concluded.

107.  Defendants' plan to involuntarily transfer Plaintiffs' and putative class members' pensions out of the Plan and place them outside ERISA and the federal uniform financial protection provided by the PBGC makes appropriate an award of temporary, preliminary and permanent injunctive, declaratory and other equitable plan-wide and class-wide relief.

108.  Questions of law or fact common to the members of the putative class predominate over any questions affecting only individual participants and beneficiaries. The predominant questions in this litigation concern the rights of Plaintiffs and putative class members to receive  injunctive, declaratory and equitable relief, and whether defendants should

be required to either maintain the status quo or provide Plaintiffs and the putative class of retirees

with an elective choice of either: (1) keeping his pension benefit in the Plan; (2) receiving a lump

sum distribution of Plan pension benefits; or (3) selecting Prudential or some other issuer of an

annuity equivalent to his or her existing Plan benefits.

109.   In this case, there are shared legal issues with no divergent factual predicates.   In

this case, the focus is entirely on the actions of defendants, not the actions of any Plaintiff or

putative class member.   The evidence of the defendants' common course of conduct will be used

to establish liability under ERISA.   Likewise, evidence of Verizon EBC's fiduciary status and

conduct will be common to Plaintiffs and all putative class members.

110.   A class action is superior to other available methods for the fair and efficient

adjudication of this controversy and members of the putative class have little interest in

individually controlling the prosecution of separate actions which would prove uneconomical.

111.   In the interests of judicial efficiency, the claims arising out of this controversy

should be consolidated in this putative class action before this Court.

112.   No undue difficulties are anticipated to result from the prosecution of this

proceeding as a class action.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs William Lee and Joanne McPartlin, individually and on behalf

of the putative class, seek orders and judgments against defendants as follows:

A.   Order the claims in this action be maintained as a class action under Fed.R.Civ.P.,

Rule 23(a), (b)(2) and (b)(3), that Plaintiffs be appointed Class representatives, the undersigned

counsel be appointed Class counsel, and require defendants at their expense to publish and mail

notification of this action to all members of the putative class;

    **B**      Grant Plaintiffs and putative class members temporary, preliminary and

permanent injunctive, declaratory and other equitable plan-wide relief requested and set forth

within the claims in this action, including:

    **1.**      Pursuant to ERISA Sections 502(a)(2) and (a)(3), 29 U.S.C. §§ 1132(a)(2)

and (a)(3), grant Plaintiffs and putative class members a declaration that the Verizon EBC

breached its ERISA fiduciary duty to make required disclosures in summary plan descriptions for

the Plan, as required by ERISA Section 102(b), 29 U.S.C. § 1022(b) and DOL Regulation 29

C.F.R. Section 2520.102-3(*l*). The Court should estop the defendants from removing Plaintiffs

and putative class members from the Plan and transferring them to a Prudential annuity.

Moreover, the Court should estop defendants from enacting and carrying out any *ad hoc* or *post

hoc* Plan amendment, including the new Article 8.3(b) to the Plan, created to enable the

Verizon/Prudential annuity transaction;

    **2.**      Pursuant to ERISA Sections 502(a)(2) and (a)(3), 29 U.S.C. §§ 1132(a)(2)

and (a)(3), grant Plaintiffs and Class members a declaration that the Verizon EBC and VIMCO

each breached its ERISA duty of loyalty and failed to discharge its duties to act in the best

interests of Plaintiffs and the putative class members, as required by ERISA Section 404(a)(1),

29 U.S.C. § 1104(a)(1);

    **3.**      Pursuant to ERISA Sections 502(a)(2) and (a)(3), 29 U.S.C. §§ 1132(a)(2)

and (a)(3), grant Plaintiffs and putative class members a declaration that the Verizon EBC and

VIMCO failed to act in compliance with the Plan's rules and violated ERISA Section

404(a)(1)(D), 29 U.S.C. § 1104(a)(1)(D);

4.      Pursuant to ERISA Sections 502(a)(2) and (a)(3),  29 U.S.C. §§ 1132(a)(2) and (a)(3), grant Plaintiffs and putative class members appropriate equitable relief, including a declaration that while the Plan authorizes the plan sponsor to transfer "assets" or "liabilities", the Plan does not give either Verizon, the Verizon EBC or VIMCO license to expel retired persons with vested pension rights and to end Plaintiffs' and putative class members' continued pension participation in the Plan;

5.      Pursuant to ERISA Sections 502(a)(2) and (a)(3),  29 U.S.C. §§ 1132(a)(2) and (a)(3), grant Plaintiffs and putative class members a declaration that Verizon, the Verizon EBC and VIMCO have violated ERISA Section 510, 29 U.S.C. § 1140;

6.      Pursuant to ERISA Sections 502(a)(2) and (a)(3),  29 U.S.C. §§ 1132(a)(2) and (a)(3), grant Plaintiffs and Class members appropriate equitable relief, including a declaration that the Verizon/Prudential annuity transaction is not in the best interests of the retirees, that the status quo be maintained until such time as Plaintiffs and putative class members are given an elective choice of either: (1) keeping his pension benefit in the Plan; (2) receiving a lump sum distribution of Plan pension benefits;  or (3) selecting Prudential or some other issuer of an annuity equivalent to his or her existing Plan benefits.

7.      Pursuant to ERISA Section 502(a)(2), 29 U.S.C. § 1132(a)(2), grant equitable and remedial relief for the benefit of the Plan, including an order requiring reversal of any transfer of Plan assets by VIMCO from Verizon's master trust to Prudential until this civil action is properly adjudicated;

8.      Grant Plaintiffs and all putative class members such other and further class-wide and plan-wide relief, including appropriate equitable relief allowable under ERISA Section

502(a)(3), 29 U.S.C. § 1132(a)(3), as the Court deems just and proper;

      C.     Order defendants' officers, employees and agents not to retaliate against Plaintiffs and putative class members on the basis of the filing or prosecution of this action;  and

      D.     Pursuant to ERISA Section 502(g)(1), 29 U.S.C. § 1132(g)(1), order Defendants to pay the reasonable value of Plaintiffs' interim and final attorney's fees for services performed, expert witness fees, accounting fees, necessary expenses of litigation, and costs of this action.

DATED this 28th day of November, 2012.      Respectfully submitted,

s/ Curtis L. Kennedy
Texas State Bar No. 11284320
Colorado State Bar No. 12351
Curtis L. Kennedy, Esq.
8405 E. Princeton Avenue
Denver, Colorado  80237-1741
Tele:  303-770-0440
CurtisLKennedy@aol.com

s/ Robert E. Goodman, Jr.
Texas State Bar No. 08158100
Robert E. Goodman, Jr., Esq.
KILGORE & KILGORE LAWYERS
3109 Carlisle Street
Dallas, Texas 75204
Tele:  214-969-9099
Fax:  214-953-0133
reg@kilgorelaw.com

Plaintiffs' Names and Addresses:

William Lee
5018 Sandestin Ct.
Garland, TX 75044-5076

Joanne McPartlin
4236 Tennyson Way
Venice, FL 34293-5245