# IN THE UNITED STATES COURT OF APPEALS
# FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**FILED**

September 15, 2016

Lyle W. Cayce
Clerk

No. 14-10553

WILLIAM LEE, Individually, and as Representatives of plan participants and plan beneficiaries of the Verizon Management Pension Plan; JOANNE MCPARTLIN, Individually, and as Representatives of plan participants and plan beneficiaries of the Verizon Management Pension Plan; EDWARD PUNDT,

        Plaintiffs - Appellants

v.

VERIZON COMMUNICATIONS, INCORPORATED; VERIZON CORPORATE SERVICES GROUP, INCORPORATED; VERIZON EMPLOYEE BENEFITS COMMITTEE; VERIZON INVESTMENT MANAGEMENT CORPORATION; VERIZON MANAGEMENT PENSION PLAN,

        Defendants - Appellees

Appeal from the United States District Court
for the Northern District of Texas

## ON REMAND FROM THE UNITED STATES SUPREME COURT

Before BENAVIDES, SOUTHWICK, and COSTA, Circuit Judges.

FORTUNATO P. BENAVIDES, Circuit Judge:

    This court previously affirmed the dismissal of Plaintiffs-Appellants' claims against Defendants-Appellees for violations of The Employee Retirement Income Security Act of 1974, 29 U.S.C. §§ 1001–1461 ("ERISA").

No. 14-10553

*See Lee v. Verizon Commc'ns, Inc.*, 623 F. App'x 132, 134 (5th Cir. 2015) (unpublished). Our affirmance was driven, in part, by the determination that Plaintiff-Appellant Edward Pundt ("Pundt"), representative of one of the two certified classes of Verizon pension-plan participants, lacked Article III standing to sue for purported fiduciary misconduct pursuant to ERISA § 409(a), 29 U.S.C. § 1109(a). *Id.* at 147. Specifically, we held that "standing for defined-benefit plan participants requires imminent risk of default by the plan, such that the participant's benefits are adversely affected," and we noted that Pundt failed to "allege the realization of risks which would create a likelihood of direct injury to participants' benefits" in this case. *Id.* at 148–49. We thus concluded that any direct harm to Pundt was "too speculative to support standing." *Id.* at 149. We also rejected Pundt's argument that "he directly suffered constitutionally cognizable injury through invasion of his . . . statutory rights [under ERISA] to proper [p]lan management," concluding that standing based on invasion of a statutory right must still "aris[e] from *de facto* injury, which is not alleged by a breach of fiduciary duty." *Id.*

Pundt filed a petition for writ of certiorari in the United States Supreme Court. The Supreme Court subsequently decided *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 194 L. Ed. 2d 635 (2016), which clarified the relationship between concrete harm and statutory violations for purposes of assessing Article III standing. After deciding *Spokeo*, the Supreme Court granted Pundt's petition for writ of certiorari, vacated our judgment in this case, and remanded the case to this court for further consideration in light of *Spokeo*. *Pundt v. Verizon Commc'ns, Inc.*, No. 15-785, 2016 WL 2945235, at *1 (May 23, 2016). We requested and received supplemental briefing from both sides regarding the impact of *Spokeo*.

There is only one narrow question for us to consider on remand: namely, whether *Spokeo* affects our previous conclusion that a plaintiff's bare

2

No. 14-10553

allegation of incursion on the purported statutory right to "proper plan management" under ERISA is insufficient to meet the injury-in-fact prong of Article III standing. We believe this conclusion remains as valid in light of *Spokeo* as it was before *Spokeo* was decided.

The Supreme Court reaffirmed in *Spokeo* that violation of a procedural right granted by statute may in some circumstances be a sufficiently concrete, albeit intangible, harm to constitute injury-in-fact without an allegation of "any *additional* harm beyond the one Congress has identified." 136 S. Ct. at 1549. However, the Supreme Court also took care to note that "Congress'[s] role in identifying and elevating intangible harms does not mean that a plaintiff automatically satisfies the injury-in-fact requirement whenever a statute grants a person a statutory right and purports to authorize that person to sue to vindicate that right." *Id.* Rather, "Article III standing requires a concrete injury even in the context of a statutory violation." *Id.* Put differently, the deprivation of a right created by statute must be accompanied by "some concrete interest that is affected by the deprivation." *Id.* (quoting *Summers v. Earth Island Inst.*, 555 U.S. 488, 496 (2009)). Thus, *Spokeo* recognizes that at minimum, a "concrete" intangible injury based on a statutory violation must constitute a "risk of real harm" to the plaintiff. *Id.*

*Spokeo* maps surprisingly well onto the present case: in *Spokeo*, the Supreme Court held that a bare allegation of a Fair Credit Reporting Act violation based on inaccurate reporting of consumer information was insufficient to establish injury-in-fact, as "not all inaccuracies cause harm or present any material risk of harm." *Id.* at 1550. In the same way, we recognized in this case that Pundt's allegation of an "invasion of [a] statutory right[] to proper [p]lan management" under ERISA was not alone sufficient to create standing where there was no allegation of a real risk that Pundt's defined-benefit-plan payments would be affected. In short, because Pundt's "concrete

3

interest" in the plan—his right to payment—was not alleged to be at risk from the purported statutory deprivation, Pundt had not suffered an injury that was sufficiently "concrete" to confer standing. We declined to hold that the mere allegation of fiduciary misconduct in violation of ERISA, divorced from any allegation of risk to defined-benefit-plan participants' actual benefits, could constitute *de facto* injury sufficient to establish constitutional standing.

Pundt argues on remand that *Spokeo* requires consideration of historical practice in determining whether an intangible harm constitutes injury-in-fact, *Id.* at 1549, and thus this court should find that Pundt has standing based on common-law trust principles. However, *Spokeo*'s recognition of history as an important consideration in Article III standing analysis is not new. Indeed, the Supreme Court has "often said that history and tradition offer a meaningful guide to the types of cases that Article III empowers federal courts to consider." *Sprint Commc'ns Co., L.P. v. APCC Servs., Inc.*, 554 U.S. 269, 274 (2008). In other words, the Supreme Court's view that history can provide a useful metric for identifying intangible harms was "often" invoked prior to *Spokeo*, yet Pundt failed to raise his trust-law theory in the district court and did not press it in his opening brief to this court beyond making a passing reference to "historical authorities." *Spokeo* thus gives us no occasion to revisit an issue that Pundt did not adequately raise and that *Spokeo* did not affect, and we reject Pundt's statutory-injury argument for the same reason we identified in our original opinion: a *de facto* injury is not alleged by reference to fiduciary misconduct under ERISA alone. *See David v. Alphin*, 704 F.3d 327, 336–37 (4th Cir. 2013) (rejecting trust-law argument and concluding that defined-benefit-plan participants lacked Article III standing to sue based solely on deprivation of statutory right).

Pundt also contends that the judgment of Congress supports finding standing in this case, as Congress's expressed concern in enacting ERISA was

to protect "the interests of participants in employee benefit plans . . . ." 29 U.S.C. § 1001(b). As we explained in our original opinion, however, a defined-benefit-plan participant's "interest[]" in the plan is his "nonforfeitable right only to" the "defined level of benefits" established under the plan. *Hughes Aircraft Co. v. Jacobson*, 525 U.S. 432, 440 (1999). We once again decline to "conflat[e] the concepts of statutory and constitutional standing" by holding that incursion on a statutorily-conferred interest in "proper plan management" is sufficient in itself to establish Article III standing. *Lee*, 623 F. App'x at 149. A bare allegation of improper defined-benefit-plan management under ERISA, without concomitant allegations that any defined benefits are even potentially at risk, does not meet the dictates of Article III; concluding otherwise would vitiate the Supreme Court's explicit pronouncement that "Article III standing requires a concrete injury even in the context of a statutory violation." *Spokeo*, at 1549; *see also Kendall v. Emps. Ret. Plan of Avon Prods.*, 561 F.3d 112, 120 (2d Cir. 2009) ("The statute does impose a general fiduciary duty to comply with ERISA, but it does not confer a right to every plan participant to sue the plan fiduciary for alleged ERISA violations without a showing that they were injured by the alleged breach of the duty."), *abrogated in part on other grounds as recognized in Am. Psychiatric Ass'n v. Anthem Health Plans, Inc.*, 821 F.3d 352, 359 (2d Cir. 2016); *Fletcher v. Convergex Grp. LLC*, __F. Supp. 3d__, No. 13-CV-9150, 2016 WL 690889, at *3 (S.D.N.Y Feb. 17, 2016) (noting that *Kendall* "firmly rejected [the] argument that defendants' violation of their statutory duties under ERISA is in and of itself an injury in fact to [the plaintiff]").

Having addressed the only issue that is even arguably implicated by *Spokeo*, we need not consider the remaining arguments raised by Pundt on remand. To the extent Pundt advances a distinct theory of standing based on the pursuit of injunctive relief, that argument has been waived. *See United*

No. 14-10553

*States v. McRae*, 795 F.3d 471, 479 (5th Cir. 2015) ("[A]n argument not raised at the district court or in the appellant's opening brief is waived . . . ."). We accordingly reinstate and publish our prior opinion, which we reproduce below.

No. 14-10553

*****

Before the court is a retirement-plan dispute brought by current and former participants and beneficiaries of Verizon's pension plan ("the Plan"). Plaintiffs, representing two certified classes, allege violations under the Employee Retirement Income Security Act of 1974, 29 U.S.C. §§ 1001-1461 ("ERISA"), by the pension plan sponsors and administrators as a result of a plan amendment and subsequent annuity purchase in December of 2012. The certified classes are distinguished by the annuity transaction, which transferred benefit obligations for some Plan beneficiaries to a group insurance annuity, resulting in the following classes: the Transferee Class, represented by Plaintiffs William Lee and Joanne McPartlin (collectively, "Transferee Class representatives"), comprising Plan participants whose retirement-benefit obligations were transferred to the annuity; and the Non-Transferee Class, represented by Plaintiff Edward Pundt ("Pundt"), comprising Plan participants whose retirement-benefit obligations remained with the Plan. Plaintiffs appeal the district court's dismissal of the claims of the Transferee Class for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6), as well as the dismissal of the sole claim of the Non-Transferee Class under Rule 12(b)(1) for lack of constitutional standing.

We affirm.

## I. BACKGROUND

### A. Factual History

Unless otherwise noted, the following factual history is based on Appellants' allegations in the second amended complaint ("SAC"), the live pleading at the time of the district court's dismissal order.

In August of 2012, Verizon Investment Management Corp. ("VIMCO"), a wholly-owned subsidiary of Verizon Communications Inc. ("Verizon"), retained Fiduciary Counselors, Inc. ("FCI or Independent Fiduciary") as an independent

No. 14-10553

fiduciary to "represent the participants and beneficiaries in connection with the selection of the insurance company (or insurance companies) to provide an annuity" and to negotiate "the terms of the annuity contract or contracts." On or about September 8, 2012, over a month prior to the date of the amendment, the Independent Fiduciary provided a written determination of the transaction's compliance with ERISA.

In October of 2012, Verizon's board of directors amended the Plan terms to provide for an annuity transaction, effective December 7, 2012. The amendment applied to Plan participants who were already receiving benefit payments as of January 1, 2010; this effectively divided the Plan participants into the 41,000 members of the Transferee Class, and the roughly 50,000 members of the Non-Transferee Class. Regarding payments to those retirees, the amendment directed the Plan to purchase an annuity meeting the following requirements: (1) guaranteeing payment of pension benefits for all transferred Plan participants; (2) maintaining benefit payments in the same form that was in effect at the time of the annuity transaction; and (3) relieving the Plan of any benefit obligation for any transferred Plan participants.[1]

Also in October of 2012, Verizon entered into a definitive purchase agreement with Prudential, VIMCO, and FCI. Under the terms of the

---

[1] The relevant provisions of the Amendment are as follows:
  (i) The annuity contract shall fully guarantee and pay each pension benefit earned by a "Designated Participant."
  (ii) The annuity contract shall provide for the continued payment of the Designated Participant's pension benefit . . . in the same form that was in effect under the Plan immediately before the annuity purchase . . . .
    . . . .
  (iv) After the annuity purchase . . . , the Plan shall have no further obligation to make any payment with respect to any pension benefit of a Designated Participant . . . . ROA.119–20.
  The term "Designated Participant" generally describes members of the Transferee Class, as it includes Plan participants who were receiving benefits at the time of the annuity transaction, and who had retired before January 1, 2010.

No. 14-10553

agreement, Verizon would purchase a single-premium, group annuity contract from Prudential for $8.4 billion, in settlement of $7.4 billion in Plan benefit obligations. Plan fiduciaries notified members of the Transferee Class about the annuity transaction.

Shortly after Plaintiffs' motion for preliminary injunction against the annuity transaction was denied, the annuity parties consummated the annuity transaction on December 10, 2012.

### B. Procedural History

The Transferee Class representatives filed their original complaint on November 27, 2012; the complaint was immediately followed by their application for a temporary restraining order.[2] In an order dated December 7, 2012 ("*Lee I*"), the district court denied the application.[3] On January 25, 2013, the Transferee Class representatives filed their first amended complaint, to which Plaintiff Pundt joined, and the district court certified the classes on March 28, 2013.

In an order dated June 24, 2013 ("*Lee II*"), the district court granted Defendants' motion to dismiss the Transferee Class's claims for failure to state a claim under Rule 12(b)(6), and the Non-Transferee Class's claim under Rule 12(b)(1) for lack of constitutional standing.[4] The court also granted Plaintiffs leave to amend.[5]

Plaintiffs filed the SAC on July 12, 2013.[6] In an order dated April 11, 2014 ("*Lee III*"), the district court dismissed the SAC in its entirety for failing

---

[2] At the request of the Transferee Class representatives, the application for temporary restraining order was converted into a motion for a preliminary injunction.

[3] *Lee v. Verizon Commc'ns Inc.*, 2012 WL 6089041, at *1 (N.D. Tex. Dec. 7, 2012) ("*Lee I*").

[4] *Lee v. Verizon Commc'ns Inc.*, 954 F.Supp.2d 486, 499 (N.D. Tex. June 24, 2013) ("*Lee II*").

[5] *Id*.

[6] ROA.1372-1422 ("SAC").

No. 14-10553

to cure the deficiencies identified in *Lee II*.[7] Specifically, the district court reasoned that, as amended, the first and third claims of the Transferee Class, as well as the claim of the Non-Transferee Class, warranted dismissal for the reasons stated in *Lee II*;[8] the district court then more fully addressed the amended allegations regarding the Transferee Class's second claim before dismissing that claim as well.[9]

## II.   DISCUSSION

### A. Standard of Review

This court reviews *de novo* a district court's dismissal for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6).[10] In doing so, the court applies the familiar *Twombly*-plausibility standard, according to which "we must accept as true all well-pleaded facts."[11] "To survive a Rule 12(b)(6) motion to dismiss, a complaint does not need detailed factual allegations, but must provide the plaintiff's grounds for entitlement to relief—including factual allegations that when assumed to be true raise a right to relief above the speculative level."[12]

The court similarly evaluates the Rule-12(b)(1) dismissal of the claim by the Non-Transferee Class for lack of standing. As with a 12(b)(6) dismissal, this court reviews *de novo* a district court's dismissal under 12(b)(1).[13] As a

---

[7] *Lee v. Verizon Commc'ns Inc.*, 2014 WL 1407416, at *9 (N.D. Tex. Apr. 11, 2014) ("*Lee III*").

[8] *See id.* at *2.

[9] *See id.* at *2–9.

[10] *See Rosenblatt v. United Way of Greater Houston*, 607 F.3d 413, 417 (5th Cir. 2010) (citing *Cuvillier v. Taylor*, 503 F.3d 397, 401 (5th Cir. 2007)).

[11] *Id.* (citing *Baker v. Putnal*, 75 F.3d 190, 196 (5th Cir. 1996)).

[12] *Id.* (internal quotation marks omitted).

[13] *See Ballew v. Continental Airlines, Inc.*, 668 F.3d 777, 781 (5th Cir. 2012) (citing *Ramming v. United States*, 281 F.3d 158, 161 (5th Cir. 2001)).

matter of subject matter jurisdiction,[14] standing under ERISA § 502(a) is subject to challenge through Rule 12(b)(1).[15] Where, as here, the movant mounts a "facial attack" on jurisdiction based only on the allegations in the complaint, the court simply considers "the sufficiency of the allegations in the complaint because they are presumed to be true."[16]

### B. Duty to Disclose under ERISA § 102(b), 29 U.S.C. § 1022(b)

The Transferee Class first asserts that that the Plan fiduciaries breached their fiduciary duties under ERISA by failing to disclose the annuity transaction's effect on payor responsibilities and participant enrollment in the Plan. At the outset, the following is undisputed: (1) the Plan provided Summary Plan Descriptions ("SPDs"); (2) the Plan fiduciaries promptly disclosed the amendment shortly after its adoption; and (3) the annuity transaction did not change the form or amount of benefits. However, Plaintiffs argue that the pre-amendment SPDs were insufficient because they did not give notice of the annuity transaction.

ERISA § 102(b) requires an SPD to describe "circumstances which may result in disqualification, ineligibility, or denial or loss of benefits."[17] In turn, the pertinent regulation promulgated by the Department of Labor ("DOL") requires an SPD to describe "circumstances which may result in . . . loss[] . . . of any benefits that a participant or beneficiary might otherwise reasonably expect the plan to provide."[18] Appellants first argue that the Verizon Employee Benefits Committee ("VEBC"), a Verizon plan fiduciary, failed to provide

---

[14] *See Cobb v. Cent. States*, 461 F.3d 632, 635 (5th Cir. 2006); *see also Hermann Hosp. v. MEBA Med. & Benefits Plan*, 845 F.2d 1286, 1288–89 (5th Cir.1988) (considering ERISA standing as a question of subject matter jurisdiction).

[15] *See* Fed. R. Civ. P. 12(b)(1).

[16] *Paterson v. Weinberger*, 644 F.2d 521, 523 (5th Cir. 1981).

[17] 29 U.S.C. § 1022(b) (2012).

[18] 29 C.F.R. § 2520.102-3(*l*) (2015).

No. 14-10553

compliant SPDs by not disclosing the possibility that benefit obligations could be transferred to an insurance-company annuity absent a plan termination or spin-off/merger. As explained below, this argument lacks merit in light of this court's precedent, which holds that ERISA does not require SPDs to describe future terms, and statutory language requiring only retrospective notice of plan amendments.

First, as Appellees note, we have previously interpreted ERISA disclosure requirements as only extending to current aspects of the plan, and to the exclusion of potential changes which are contingent upon a plan amendment. In *Wise v. El Paso Natural Gas Co.*,[19] this court held that "Section 1022(b) relates to an individual employee's eligibility under then existing, current terms of the Plan and not to the possibility that those terms might later be changed, as ERISA undeniably permits."[20] The decisions cited by Appellants do not vitiate this principle, as both decisions addressed the disclosure of existing plan terms, not potential, amendment-contingent terms.[21] In this case, prior to the October-2012 amendment directing the annuity purchase, the Plan only allowed for the transfer of benefit obligations through the Plan's termination or merger into another pension plan; SPDs issued prior to the amendment were only required to address those circumstances.

Further, it is undisputed that the Plan fiduciaries provided notice shortly after the amendment's adoption, well within the time limits imposed for notice of plan amendment. ERISA only requires that administrators provide a summary description of any material modification or change "not

---

[19] 986 F.2d 929 (5th Cir. 1993).

[20] *Id.* at 935.

[21] *See Koehler v. Aetna Health Inc.*, 683 F.3d 182, 189 (5th Cir. 2012); *Layaou v. Xerox Corp.* 238 F.3d 205, 211 (2d Cir. 2001)).

No. 14-10553

later than 210 days after the end of the plan year in which the change is adopted."[22] In keeping with this language, we previously held in *Martinez v. Schlumberger, Ltd.*[23] that, within the context of ERISA disclosure requirements, there is no employer duty "to affirmatively disclose whether it is considering amending its benefit plan."[24] Appellees also correctly note that the pre-amendment SPDs advised participants of Verizon's reservation of the right to amend the Plan, and the possibility that an amendment might affect their rights under the Plan.

As a second basis for violation, the Transferee Class alleges that the pre-amendment SPDs failed to advise of the possible "loss of benefits." The district court rejected this claim because the Transferee Class failed to allege a change in the amount of benefits they would receive. On appeal, the Transferee Class acknowledges that the amount of benefits remains unchanged under the terms of the annuity contract. However, the Transferee Class also asserts that the phrase "loss of benefits" encompasses federal protections under ERISA and the Pension Benefit Guaranty Corporation ("PBGC").[25] Appellants, however, provide no authority supporting the inclusion of ERISA and PBGC protections as "benefits" within the meaning of § 102. Countenancing against Appellants' argument, this interpretation of "benefits" is more expansive than the ERISA regulation governing the purchase of annuities by plan fiduciaries ("Annuitization Regulation"), which requires that such transactions guarantee a participant's "entire benefit rights."[26] As discussed further below, the annuity agreement does not guarantee ERISA and PBGC protections, but Appellants

---

[22] 29 U.S.C. § 1024(b)(1)(B).
[23] 338 F.3d 407 (5th Cir. 2003).
[24] *Id.* at 428.
[25] *Id.*
[26] 29 C.F.R. § 2510.3-3(d)(2)(ii) (2015).

No. 14-10553

do not dispute that the transaction complies with the Annuitization Regulation's guarantee requirement.

Accordingly, we find no error in the district court's dismissal of the Transferee Class's claim under ERISA § 102.

## C. Fiduciary Duties under ERISA § 404(a)(1), 29 U.S.C. § 1104

The Transferee Class asserts several breaches of fiduciary duties under ERISA § 404(a)(1)(A), which requires that plan fiduciaries use plan assets "for the exclusive purpose of[] . . . providing benefits" and "defraying reasonable expenses of administering the plan."[27] In doing so, a fiduciary must act "solely in the interest of [plan] participants,"[28] and employ the "care, skill, prudence, and diligence" of a "prudent man" acting in like circumstances.[29] Section 8.5 of the Plan mirrors that of § 404, requiring that assets of the Plan be used "for the exclusive benefit of [participants and beneficiaries] and shall be used to provide benefits under the Plan and to pay the reasonable expenses of administering the Plan and the Pension Fund, except to the extent that such expenses are paid by [Verizon]."[30]

_Fiduciary vs. Non-Fiduciary Functions_. First, it behooves the analysis to distinguish between fiduciary and non-fiduciary roles, a function-centric consideration "that is aided by the common law of trusts which serves as ERISA's backdrop."[31] Further, though an employer may, at different times, wear "hats" as both a sponsor and administrator,[32] "fiduciary duties under ERISA are implicated only when it acts in the latter capacity."[33] Thus, where

---

[27] 29 U.S.C. § 1104(a)(1)(A) (2012).
[28] _Id_. § 1104(a)(1).
[29] _Id_. § 1104(a)(1)(B).
[30] ROA.83.
[31] _Beck v. PACE Intern. Union_, 551 U.S. 96, 101 (2007).
[32] _See Pegram v. Herdrich_, 530 U.S. 211, 225–26 (2000).
[33] _Beck_, 551 U.S. at 101.

14

No. 14-10553

a claim alleges breach of an ERISA fiduciary duty, the threshold question is whether the "person employed to provide services under a plan . . . was acting as a fiduciary (that is, was performing a fiduciary function) when taking the action subject to complaint."[34] In making this threshold evaluation, "[a] person is a fiduciary only to the extent he has or exercises specified authority, discretion, or control over a plan or its assets."[35]

In contrast, we have previously held that actions by a plan sponsor "to modify, amend or terminate the plan" are outside the scope of fiduciary duties; "such decisions are those of a trust settlor, not a fiduciary."[36] In *Hughes Aircraft Co. v. Jacobson*, the Supreme Court noted that, "[i]n general, an employer's decision to amend a pension plan concerns the composition or design of the plan itself and does not implicate the employer's fiduciary duties which consist of such actions as the administration of the plan's assets," as well as decisions "regarding the form or structure of the Plan . . . ."[37] The *Jacobson* Court emphatically concluded that "without exception, plan sponsors who alter the terms of a plan do not fall into the category of fiduciaries."[38]

Courts have drawn a distinction between decisions to alter a plan, and the implementation of those decisions. For example, in *Beck v. PACE Intern. Union*, the Court noted the distinction between whether to terminate a plan through an annuity purchase, and the fiduciary obligation in its selection of an

---

[34] *Pegram*, 530 U.S. at 226.
[35] *Kirschbaum v. Reliant Energy, Inc.*, 526 F.3d 243, 251 (5th Cir. 2008) (internal quotation marks omitted); s*ee also* 29 U.S.C. § 1002(21)(A) (2012) (providing that "[a] person is a fiduciary with respect to a plan to the extent (i) he exercises any discretionary authority or discretionary control respecting management of such plan or exercises any authority or control respecting management or disposition of its assets[] . . . or (iii) he has any discretionary authority or discretionary responsibility in the administration of such plan.").
[36] *Id.* at 251.
[37] *Hughes Aircraft Co. v. Jacobson*, 525 U.S. 432, 444 (1999).
[38] *Id.* at 444-45.

15

No. 14-10553

annuity provider.[39] Appellees rely in part upon *Beck* to support two sponsor-fiduciary distinctions, distinctions which are disputed by Appellants but which affect multiple issues.

*Beck* involved an employer's filling dual roles as plan sponsor and administrator, and the Court considered the question of whether a plan sponsor's choice of plan termination through the purchase an annuity, rather than merger with another pension plan, constituted a decision as a plan sponsor or fiduciary.[40] The *Beck* Court first noted the general principle that an employer's decisions regarding the form or structure of a plan are immune from ERISA's fiduciary obligations, and that these decisions include termination and (in most cases) merger.[41] Recognizing that ERISA imposed fiduciary obligations on the method of termination, *e.g.* the fiduciary obligation on selecting an annuity provider, the *Beck* Court acknowledged that the choice between possible methods of termination, *i.e.* annuitization or merger, created a plausible basis to consider merger as a fiduciary action within that context.[42] Ultimately, *Beck* did not reach ERISA's fiduciary application to merger, as the Court determined merger was not a permissible method of termination under ERISA.[43]

Appellees first cite *Beck* in support of the proposition that the decision to enter into an annuity is a sponsor decision immune from ERISA's fiduciary obligations. In turn, Appellants argue that *Beck* is inapposite as it analyzed a plan termination, rather than an ongoing plan. This distinction does not vitiate *Beck*'s application to the instant circumstances. The *Beck* Court broadly described decisions regarding the form and structure of a plan as those of a

---

[39] 551 U.S. 96, 101–02 (2007).
[40] *See id.*
[41] *See id.*
[42] *See id.* at 102.
[43] *Id.* at 110.

plan sponsor, and its primary focus on one type of sponsor decision does not undercut the application to other sponsor decisions regarding a plan's form and structure. Accordingly, we hold the annuity amendment was a sponsor function of plan design, authorized under ERISA through the Annuitization Regulation.

Appellees also cite *Beck* for the principle that an employer's decision to maintain or remove pension liabilities is a design decision and settlor function. In deciding that merger was not a permissible form of termination, the *Beck* Court compared the effect of annuity purchases and merger, emphasizing that the latter "represents a *continuation* rather than a *cessation* of the ERISA regime."[44] Despite discussing the annuity purchase's effect of "formally sever[ing] the applicability of ERISA to plan assets and employer obligations" (including the employer's release from ERISA's requirement to make PBGC premium payments), the *Beck* Court did not impute fiduciary aspects to the sponsor's decision to sever ERISA's applicability.[45] Consistent with *Beck*, therefore, we consider the decision to transfer pension assets outside ERISA coverage as a sponsor decision immune from fiduciary obligations.

Also relating to the sponsor-fiduciary distinction, Appellants assert that the district court mischaracterized some of their claims as asserted against Verizon and the Plan fiduciaries, VIMCO and VEBC. In Appellants' view, the claim was asserted only against the Plan fiduciaries, and the district court's considering the claim as asserted against Verizon was questionable. However, regarding some of the alleged bases for fiduciary breach, the allegations in the SAC implicate the act of amending the Plan to direct the annuity purchase, an act by Verizon as settlor, as well as the acts involved in implementing the

---

[44] *Id.* at 106 (emphasis in original).
[45] *Id.*

annuity purchase, which involve functions of the Plan fiduciaries. As a result, we hold the district court properly addressed Verizon's role as sponsor, before addressing the implementation of the transaction involving VIMCO and VEBC. We separately consider these alleged breaches below.

### 1. Alleged Breach by Plan Sponsor

Appellants first assert that Verizon breached its fiduciary duty by entering into the annuity transaction, which resulted in the partial transfer of pension obligation from an ongoing Plan. Because such a transfer during an ongoing plan is not expressly authorized by an ERISA provision or regulation, Appellants posit that Verizon's decision was subject to ERISA's fiduciary duty provisions. This argument lacks merit for several reasons: (1) precedent suggests that the amendment was a settlor function; (2) ERISA and related regulations authorize annuity purchases, and do not prohibit such purchases during an ongoing plan; and (3) even assuming ERISA prohibits annuity purchases during an ongoing plan, Appellants cite no authority that the prohibition's violation would subject an otherwise settlor function to fiduciary requirements.

First, the precedent cited above describes the decision to amend a pension plan concerning the composition or design of the plan as a settlor function, immune from fiduciary strictures. Accordingly, the decision to amend the Plan and transfer assets into an annuity was made solely by Verizon in its settlor capacity. Appellants' argument against this principle, broadly that any action which disposes of plan assets creates fiduciary obligations, is not supported by any authority. The *Beck* Court tangentially addressed Appellants' argument, noting that "[t]he purchase of an annuity is akin to a transfer of assets and liability (to an insurance company)" yet maintaining its

No. 14-10553

position that a decision to enter into an annuity (albeit during a plan termination) was a settlor function.[46]

Secondly, Appellants do not proffer any authority that would prohibit the transfer from an ongoing plan via an annuity transaction. At the same time, Appellees respond with ERISA provisions and regulations which suggest such transactions are authorized, and at least are not foreclosed.

In the first instance, ERISA provisions, as well as regulations promulgated by the Department of Labor, set forth several mechanisms by which an employer may remove liabilities from a pension plan, one of which is through transfer to an insurance company by an annuity purchase.[47] Upon transfer via annuity purchase, an individual is no longer "a participant covered under an employee pension plan or a beneficiary receiving benefits under an employee pension plan," so long as the individual's entire benefit rights are (1) guaranteed by the insurance company; (2) enforceable against the insurance company at the sole choice of the individual; and (3) the individual is issued notice of the benefits to which he or she is entitled under the plan.[48] Appellants do not dispute that the annuity transaction complied with these requirements, transferring the entire benefit rights of the Transferee Class and satisfying the three requirements for removal from the Plan.

Regarding the ability of a plan sponsor to perform an annuity transfer *during an ongoing plan*, neither ERISA itself nor the regulations promulgated thereunder speak directly to this point. However, a Department of Labor interpretive bulletin describes circumstances in which a pension plan might purchase annuity contracts, and notes that "*in the case of an ongoing plan,*

---

[46] *Id.* at 102.
[47] *See* 29 C.F.R. § 2510.3-3(d)(2)(ii) (2015). *See also* 29 U.S.C. §§ 1341 (termination); 1058 (merger).
[48] 29 C.F.R. § 2510.3-3(d)(2)(ii) (2012).

19

No. 14-10553

annuities might be purchased for participants who are retiring or separating from service with accrued vested benefits."[49] Although the bulletin does not specifically describe this circumstance, the bulletin describes potential circumstances non-exclusively, suggesting that such transfers are permitted, especially when considered in conjunction with the annuity-transfer regulation.

Finally, even assuming *arguendo* that ERISA prohibits annuity purchases during ongoing plans, Appellants cite no authority which would make the amendment a fiduciary function due to violation of that prohibition. In light of the above considerations, we hold that the transfer of pension liabilities from an ongoing plan through an annuity transaction amendment is a settlor function, permitted under ERISA, or, alternatively, that such transactions are not subject to fiduciary duty requirements.

## 2. Alleged Breaches by Plan Fiduciaries

The Transferee Class also alleges breach of fiduciary duty in the implementation of the amendment. In this regard, the Transferee Class asserts several grounds, alleging that Plan fiduciaries: (1) failed to hold the annuity contract as a Plan asset; (2) failed to obtain consent of the Transferee Class members; (3) failed to communicate with the Transferee Class members prior to the annuity transaction; (4) violated the terms of § 8.5 of the Plan; and

---

[49] *See* Interpretive Bulletins Relating to the Employee Retirement Income Security Act of 1974, 60 Fed. Reg. 12328, 12328 (Mar. 6, 1995) (providing,

> [p]ension plans purchase benefit distribution annuity contracts in a variety of circumstances. Such annuities may be purchased for participants and beneficiaries in connection with the termination of a plan, or in the case of an ongoing plan, annuities might be purchased for participants who are retiring or separating from service with accrued vested benefits.).

No. 14-10553

(5) failed to select more than one annuity provider.[50] We consider these breaches *seriatim*.

*Failure to Hold Annuity Contract within Plan as Plan Asset*. The Transferee Class maintains that Plan beneficiaries should have held the annuity contract as a Plan asset ("internal annuity"), and that such an arrangement would have maintained ERISA and PBGC protections for the benefit of the class members.

However, as the district court reasoned, the plan amendment did not allow for the Plan to remain obligated for the benefit of the Transferee Class. As noted above, the Plan fiduciaries are only responsible for decisions over which they have discretion. Although disputed by Appellants, the terms of the amendment clearly provide that the Plan will have no obligation to make any payment for the pension benefits of the Transferee Class after the annuity transaction. Within the strictures of the amendment terms, Plan fiduciaries were without discretion to maintain pension obligations of the Transferee Class within the Plan.[51]

*Failure to Obtain Transferee Consent*. The Transferee Class also asserts that the Plan fiduciaries should have obtained the consent of the Transferee Class members before transferring the pension obligations to the annuity

---

[50] The Transferee Class also alleged that the annuity transaction breached a fiduciary duty by underfunding the Plan in violation of several statutes. The district court dismissed this claim and, although the Transferee Class makes passing reference to underfunding in its brief, it does not substantively urge review the district court's dismissal of this ground on appeal. The issue is therefore waived. *See Cinel v. Connick*, 15 F.3d 1338, 1345 (5th Cir. 1994) (citation omitted).

[51] The SAC does not describe in any detail how selecting an internal annuity was an amendment-compliant option within the discretion of Plan fiduciaries. At a minimum, however, maintaining the PBGC protections sought by the Transferee Class requires the payment of premiums, *see* 29 U.S.C. § 1307, which would run afoul of the amendment's requirement that, after the annuity transaction, "the Plan shall have no further obligation to make *any payment with respect to any pension benefit* of a Designated Participant." ROA.120 (emphasis added).

No. 14-10553

contract. In the first instance and as the district court noted, the determination to transfer assets to an annuity was a decision made by Verizon as settlor, and does not fall within the scope of its fiduciary duties. In *Hughes Aircraft Co. v. Jacobson*, the Supreme Court held that three fiduciary claims were foreclosed because "without exception, plan sponsors who alter the terms of a plan do not fall into the category of fiduciaries."[52] The Eighth Circuit decision in *Howe v. Varity Corp.*,[53] a pre-*Jacobson* decision to which Appellants cite for the consent requirement, does not succeed in imputing fiduciary obligations to an action which the Supreme Court has deemed immune from those obligations. We further note that Appellants' position is neither supported by the terms of ERISA, which itself contains no such requirement for consent, either in the provisions detailing fiduciary duties,[54] or in the provisions governing ERISA-compliant annuity purchases.[55]

*Failure to Communicate with Transferees*. The Transferee Class also asserts that Plan fiduciaries breached their duty by not communicating with beneficiaries. Although the Transferee Class asserts that "ERISA and its accompanying regulations" require such communication, the Transferee Class does not cite any actual ERISA provisions, and only cites to the Ninth Circuit decision of *Booton v. Lockheed Med. Benefit Plan*, an inapposite opinion which discussed the ERISA-required documentation following the denial of benefits.[56] Although the Annuity Regulation does require that participants receive notice of the terms of the benefits to which they are entitled as part of

---

[52] *Hughes Aircraft Co. v. Jacobson*, 525 U.S. 432, 443 (1999) (citing *Lockheed Corp. v. Spink*, 517 U.S. 882, 890-91 (1996)).

[53] 36 F.3d 746, 756 (8th Cir. 1994), *aff'd on other grounds*, 516 U.S. 489 (1996).

[54] 29 U.S.C. § 1104(a).

[55] 29 C.F.R. § 2510.3-3(d)(2)(ii).

[56] 110 F.3d 1461, 1463 (9th Cir. 1997).

the annuity transaction,[57] it is undisputed that the Transferee Class received this notice. After the annuity transaction, the benefits are no longer governed by ERISA, and any nondisclosure does not give rise to a cognizable action.[58]

*Expenses of Annuity Transaction.* As part of the annuity transaction, it is undisputed that Verizon paid Prudential a total of $8.4 billion, $1 billion more than the amount of the transferred liabilities. The Transferee Class alleges that Verizon violated § 8.5 of the Plan, requiring that Plan assets be used for the exclusive benefit of Plan beneficiaries and participants, as well as reasonable expenses of administering the Plan and Pension Fund. In the SAC, the Transferee Class alleges as follows:

> However, almost $1 billion more than necessary to cover the transferred liabilities was paid by Prudential by the Plan for amounts other than benefits and reasonable expenses of administering the Plan. The extra $1 billion payment was applied toward expenses, not for administering the ongoing Plan, but to enable avoidance of payment of such expenses by the Plan sponsor, [Verizon], thus violating Section 8.5 . . . .[59]

> The extra $1 billion payment was used to pay Verizon's-the settlor's obligations for third-party costs related to the annuity transaction, including fees paid to outside lawyers, accountants, actuaries, financial consultants and brokers. Those expenses and fees should have been charged to Verizon's corporate operating revenues, not charged to the Plan and Master Trust.[60]

The district court ruled that these allegations failed to state a claim by not specifying "which aspects of the extra $1 billion of expenditures were unreasonable, or how they were unreasonable."[61] The Transferee Class argues that the district court's reasonableness analysis is misplaced, and that the

---

[57] 29 C.F.R. § 2510.3-3(d)(2)(ii).

[58] *See Beck v. PACE Intern. Union*, 551 U.S. 96, 106 (2007).

[59] SAC at ¶ 114 (emphasis in original).

[60] *Id*. at ¶ 115.

[61] *Lee III*, 2014 WL 1407416, at *4 (citing *Lee II*, 954 F.Supp.2d at 494).

proper inquiry is whether the additional $1 billion in administrative costs was a settlor cost which was wrongfully paid from Plan assets, constituting a fiduciary breach. The Transferee Class supports their position by citing to a Department of Labor advisory opinion discussing plan-related expenses for which a settlor is responsible. The advisory opinion provides:

> Expenses incurred in connection with the performance of settlor functions would not be reasonable expenses of a plan as they would be incurred for the benefit of the employer and would involve services for which an employer could reasonably be expected to bear the cost in the normal course of its business operations. *However, reasonable expenses incurred in connection with the implementation of a settlor decision would generally be payable by the plan.*[62]

Appellants quote the first portion, but omit the italicized portion of the advisory opinion from their brief.[63] The effect of the advisory opinion, upon which Appellants otherwise rely, is two-fold. First, by contemplating that expenses implementing a settlor decision, such as an amendment and re-structuring of a plan, are payable by the plan, the advisory opinion refutes Appellants' argument that expenditures not associated with plan administration are unreasonable. Second, since implementation expenses by the plan are permitted to the degree they are reasonable, the advisory opinion focuses the critical inquiry on the reasonableness of the expenses.

In light of the foregoing, reasonableness of the expenses must be addressed by the Transferee Class's allegations. Here, although the allegations enumerate various expenses associated with the implementation of Verizon's decision as settlor, they wholly fail to address how those expenses are not reasonable expenses which are payable by the plan. To be sure, $1 billion in

---

[62] Dept. of Labor Advisory Opinion 2001-01A (January 18, 2001) (emphasis added). Available at: http://www.dol.gov/ebsa/regs/aos/ao2001-01a.html.

[63] *See* Blue Br. 38–39.

expenses is a large sum but, in light of the $7.5 billion in attendant obligations, we will not conclude that this allegation alone is sufficient to support unreasonableness under our pleading standards. In light of the threadbare allegations, along with the size and complexity of the annuity transaction, we agree with the district court's dismissal of this ground as insufficiently supported.

_Failure to Select Multiple Annuity Providers_. The Transferee Class further alleges a breach of fiduciary duty by selecting Prudential as the sole annuity provider. Regarding the selection of an annuity provider, this court described the relevant inquiry in _Bussian v. RJR Nabisco, Inc._, as follows:

> [W]hether the fiduciary, in structuring and conducting a thorough and impartial investigation of annuity providers, carefully considered [the factors enumerated in the Department of Labor Interpretive Bulletin 95-1] and any others relevant under the particular circumstances it faced at the time of decision. If so, a fiduciary satisfies ERISA's obligations if, based upon what it learns in its investigation, it selects an annuity provider it "reasonably concludes best to promote the interests of [the plan's] participants and beneficiaries."[64]

In a later decision, we clarified that the test of fiduciary prudence "is one of conduct, not results."[65] Even where a fiduciary's conduct does not meet that standard, "ERISA's obligations are nonetheless satisfied if the provider selected would have been chosen had the fiduciary conducted a proper investigation."[66]

In support of this showing, the Transferee Class simply alleges that a more prudent choice would have been to contract with more than one insurer, to avoid "put[ting] all of the Plan's eggs in one basket" and "placing everyone

---

[64] 223 F.3d 286, 300 (5th Cir. 2000) (quoting _Donovan v. Bierwirth_, 680 F.2d 263, 271 (2d Cir. 1982)) (second alteration in original).

[65] _Kirschbaum v. Reliant Energy, Inc._, 526 F.3d 243, 253 (5th Cir. 2008).

[66] _Bussian v. RJR Nabisco, Inc._, 223 F.3d 286, 300 (5th Cir. 2000) (citation omitted).

No. 14-10553

in jeopardy of losing retirement benefits based upon the fortunes of a single insurer."[67] The district court ruled that these allegations did not support a fiduciary breach because they were conclusory.[68] While that is a basis for dismissing this ground, the allegations also only implicate the results of the process, and not the conduct of FCI.

Additionally, however, the SAC includes allegations implicating the conduct of the Plan fiduciaries, asserting that the Prudential selection occurred on the same day as the amendment's adoption and that "VIMCO and Plan fiduciaries did not prudently allow any period of time, much less a reasonable time period for consideration [of the annuity provider(s)]."[69] Acknowledging that these allegations might plausibly assert that the Plan fiduciaries did not consider any annuity provider other than Prudential, the district court ruled that such an interpretation nevertheless was rendered implausible in light of other allegations in the SAC. To wit, the SAC alleges both that VIMCO employed FCI almost two months prior to the alleged date of decision,[70] and that FCI had submitted a written determination of the transaction's compliance with ERISA over a month prior to the date of the amendment.[71]

We agree, and find no error in the district court's dismissal of the Transferee Class's claim for fiduciary breach.

### D. Violation of ERISA § 510, 29 U.S.C. § 1140

The Transferee Class also alleged a violation of ERISA § 510 in the Plan amendment's transfer of benefit obligations for only certain Plan participants,

---

[67] SAC at ¶ 109.
[68] *See Lee III* at 2014 WL 1407416, at *7.
[69] SAC at ¶ 110.
[70] *Id.* at ¶ 29(A).
[71] *Id.* at ¶ 29(C).

asserting that such expulsion represented intentional interference with rights of the transferred participants.[72]

Section 510 provides that it is "unlawful for any person to discharge, fine, suspend, expel, discipline, or discriminate against a participant . . . for the purpose of interfering with the attainment of any right to which such participant may become entitled under the plan."[73] The district court dismissed this claim, ruling that the Transferee Class failed to allege a viable right with which Verizon intended to interfere.[74]

Although acknowledging that § 510 requires discrimination "for the purpose of interfering with" a right, Appellants posit that § 510 prohibits expulsion without any intent-to-interfere requirement. Appellees argue that the prohibition on expulsion, like that on discrimination, must be made with the intent to interfere with a right under the plan. Neither party provides authority for their positions, and instead rely solely on their interpretation of the provision's language.

Appellees' argument that expulsion must be attended by intent to interfere in order to be actionable, however, is supported by a practical consideration. Appellants' construction would divorce the intent-to-interfere requirement from any prohibition other than discrimination, which would also divorce those prohibitions from the object of the interference, *i.e.* "any right to which such participant may become entitled under the plan." Such a reading,

---

[72] As an initial point, Appellants argue that this case brings the question of whether a plan amendment can be actionable under § 510 directly before the court, and cites several previous opinions which did not address the issue. *See McGann v. H & H Music Co.*, 946 F.2d 401, 406 n.8 (5th Cir. 1991), *cert. denied sub nom*, *Greenberg v. H & H Music Co.*, 506 U.S. 981 (1992); *Hines v. Mass. Mut. Life Ins. Co.*, 43 F.3d 207, 210 n.5 (5th Cir. 1995), *overruled on other grounds*, *Arana v. Ochsner Health Plan*, 338 F.3d 433 (5th Cir. 2003). However, because we hold that Appellants failed to allege a right with which Verizon intended to interfere, the issue is not before us.

[73] 29 U.S.C. § 1140.

[74] *Lee III*, 2014 WL 1407416, at *2 (citing *Lee II*, 954 F.Supp.2d at 495).

which separates ERISA prohibitions from any rights in the ERISA-governed plan, is overly broad.

Thus reading the expulsion prohibition to require an intent to interfere with a right under the Plan, Appellees proffer two bases for affirming the district court's dismissal of this claim. First, as the district court ruled, the Transferee Class did not identify a viable right with which Verizon interfered. In the SAC, the Transferee Class alleges interference with two rights, their continued participation in the Plan, and ERISA and PBGC protections. The Transferee Class asserts their right to continued participation arises from the language in the SPD, providing: "You are a plan participant as long as you have a vested benefit in the plan that has not been paid to you in full."[75] The district court rejected this argument, noting that the Annuitization Regulation provides that an individual ceases to be a participant when benefit rights are guaranteed by an insurance company.[76] On appeal, Appellants respond that, where the language of an SPD conflicts with that of a regulation, the SPD should control. This argument is unavailing even assuming the SPD controls because the SPD advised participants of the potential amendments which could affect their rights.[77] Although unaddressed by the district court, the Transferee Class assertion of rights in ERISA and PBGC protections is unsupported. As previously discussed regarding Appellants' similar assertion in Issue I, there is little support in ERISA provisions or regulations, or case law, for including ERISA protections and PBGC benefits as rights to which a plan participant is entitled.[78] Further, as Appellees point out, the right to any

---

[75] ROA.77.

[76] *See* 29 C.F.R. § 2510.3-3(d)(2)(ii) (2015).

[77] ROA.75.

[78] *See* III.B., *supra*.

No. 14-10553

of ERISA and PBGC protections is dependent on the class members' right to continued participation.

By failing to allege a viable right with which the amendment interfered, the Transferee Class failed to state a claim and we find no error in the dismissal of this claim.

### E. Constitutional Standing

On behalf of the Non-Transferee Class, Plaintiff Pundt asserts, through ERISA § 502(a)(2), 29 U.S.C. §§ 1132(a)(2) and (a)(3), a claim for relief under ERISA § 409(a), 28 U.S.C. § 1109, for violation of fiduciary obligations by the Plan fiduciaries. The district court ruled in *Lee III* that Pundt lacked constitutional standing to assert this claim, as asserted in the SAC, by reference to its prior basis for dismissal in *Lee II*.[79] Pundt challenges this ruling on appeal, and we must first address this challenge prior to any consideration of the merits since "[t]he requirement that jurisdiction be established as a threshold matter . . . is inflexible and without exception."[80]

Section 502(a)(2) of ERISA allows a civil action to be brought by "a participant, beneficiary or fiduciary for appropriate relief under [ERISA § 409]."[81] In turn, § 409(a) creates a right to relief against fiduciaries for the restoration of any loss to a plan resulting from the breach of "any of the responsibilities, obligations, or duties imposed upon fiduciaries by this subchapter."[82] On appeal, the Non-Transferee Class asserts that Plan fiduciaries breached fiduciary duties by paying an excessive and unreasonable expense, echoing the ERISA § 404 basis alleged by the Transferee Class.[83]

---

[79] *See Lee III*, 2014 WL 1407416, at *2 (citing *Lee II*, 954 F.Supp.2d at 496).

[80] *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 94–95 (1998).

[81] 29 U.S.C. 1132(a)(2) (2012).

[82] 29 U.S.C. 1109 (2012).

[83] As with the allegations by the Transferee Class regarding breach of fiduciary duties under ERISA § 404(a), the Non-Transferee Class alleged below that the annuity transaction

No. 14-10553

The dispute centers not on whether Pundt has statutory standing under § 502, but instead whether he has constitutional standing under Article III.[84] In order to establish the "irreducible, constitutional minimum" of Article-III standing,[85] "a plaintiff must show (1) an injury in fact, (2) a sufficient causal connection between the injury and the conduct complained of, and (3) a likelihood that the injury will be redressed by a favorable decision."[86] The showing involves an injury-in-fact requirement that the plaintiff has a "personal stake in the outcome of the controversy,"[87] such that the injury is "concrete and particularized," and "actual or imminent, not conjectural or hypothetical."[88] "An allegation of future injury may suffice if the threatened injury is 'certainly impending,' or there is a 'substantial risk' that the harm will occur.'"[89]

The district court ruled that Pundt had failed to allege an injury in fact sufficient to support constitutional standing. Appellants argue Pundt was injured through "losses to Plan assets held on [Pundt's] behalf as a direct result of the fiduciary mismanagement of Plan assets in violation of ERISA," and that this "invasion of his statutory right to proper management of Plan assets" is sufficiently concrete to provide standing.[90] Appellees argue instead that constitutional standing requires allegations to support injury against an

---

underfunded the Plan in violation of ERISA and the Internal Revenue Code. The Non-Transferee Class, however, does not urge review of those allegations on appeal.

[84] U.S. CONST. art. III, § 2.

[85] *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992).

[86] *Susan B. Anthony List v. Driehaus*, --- U.S. ---, 134 S.Ct. 2334, 2341 (2014) (quoting *Lujan*, 504 U.S. at 560-61) (internal quotation marks and alterations omitted).

[87] *Id*. (quoting *Warth v. Seldin*, 422 U.S. 490, 498 (1975)).

[88] *Id*. (quoting *Lujan*, 504 U.S. at 560) (internal quotation marks omitted).

[89] *Id*. (quoting *Clapper v. Amnesty Int'l USA*, 568 U.S. ---, --- n.5, 133 S.Ct. 1138, 1147, 1150 n.5) (internal quotation marks omitted).

[90] Blue Br. 52.

No. 14-10553

individual's benefit payments, rather than injury to the plan as a whole. We agree with the district court's dismissal for lack of subject matter jurisdiction.

*Direct Harm to Participants.* Pundt first argues that fiduciary misconduct to his defined benefit plan presents individually cognizable harm, but this position is not supported by case law. The cases cited by Appellants discuss plans which, in contrast to the defined-benefit plan at issue here, present a more direct risk of harm from fiduciary misconduct.[91] For example, as the Supreme Court explained in *LaRue v. DeWolff, Boberg & Assocs.*, "[f]or defined contribution plans . . . fiduciary misconduct need not threaten the solvency of the entire plan to reduce benefits below the amount that participants would otherwise receive."[92] As a result, other circuit courts have held that participants in defined-contribution plans had redressable, Article III standing because alleged fiduciary breaches had a direct effect on the amount of benefits.[93]

A defined-contribution plan presents a starkly different circumstance than a defined-benefit plan, which "'as its name implies, is one where the employee, upon retirement, is entitled to a fixed periodic payment.'"[94] In contrast to plans in which fiduciary misconduct might present a more direct impact on a participant's interest, fiduciary misconduct in a defined-benefit plan "will not affect an individual's entitlement to a defined benefit unless it creates or enhances the risk of default by the entire plan" since such a plan

---

[91] *See Tolbert v. RBC Capital Markets Corp.*, 758 F.3d 619 (5th Cir. 2014) (considering ERISA's application to a wealth accumulation plan, another type of "employee pension benefit plan" whereby benefits are dependent upon individual employee contributions and investment performance); *Leigh v. Engle*, 727 F.2d 113 (7th Cir. 1984) (considering a profit-sharing trust).

[92] *LaRue v. DeWolff, Boberg & Assocs., Inc.*, 552 U.S. 248, 255–56 (2008).

[93] *See, e.g., Harris v. Amgen, Inc.*, 573 F.3d 728, 735–36 (9th Cir. 2009).

[94] *Beck v. PACE Intern. Union*, 551 U.S. 96, 98 (2007) (quoting *Comm'r v. Keystone Consol. Indus., Inc.*, 508 U.S. 152, 154 (1993)).

31

"consists of a general pool of assets rather than individual dedicated accounts."[95] As a result, the injury to participants like Pundt is attenuated as, prior to default under the plan, "the employer typically bears the entire investment risk and—short of the consequences of plan termination—must cover any underfunding as the result of a shortfall that may occur from the plan's investments."[96] Moreover, even where an employer is unable to cover underfunding, the impact on participants is not certain since the PBGC provides statutorily-defined protection of participants' benefits.[97]

The degree to which the impact of fiduciary misconduct must be realized on this causal chain in order to establish standing is a matter of first impression for this court. However, considering similar circumstances, our sister circuits have concluded that constitutional standing for defined-benefit plan participants requires imminent risk of default by the plan, such that the participant's benefits are adversely affected; in turn, those courts have held that fiduciary misconduct, standing alone without allegations of impact on individual benefits, is too removed to establish the requisite injury.[98] The Fourth Circuit found such "risk-based theories of standing unpersuasive, not least because they rest on a highly speculative foundation lacking any discernible limiting principle."[99] It is true that those courts considered plans which remained overfunded after the alleged fiduciary misconduct, while here the complaint alleges that, immediately after the annuity transaction, the plan

---

[95] *LaRue*, 552 U.S. at 255 (contrasting the impact of fiduciary misconduct in defined-contribution and defined-benefit plans).

[96] *Hughes Aircraft Co. v. Jacobson*, 525 U.S. 432, 439 (1999).

[97] *See* 29 U.S.C. § 1322.

[98] *See, e.g.*, *David v. Alphin*, 704 F.3d 327, 338 (4th Cir. 2013); *Harley v. Minn. Mining & Mfg. Co.*, 284 F.3d 901, 906 (8th Cir. 2002), *Perelman v. Perelman*, 919 F.Supp.2d 512, 517–520 (E.D. Pa. Jan. 24, 2013), *aff'd*, 2015 WL 4174537 (3rd Cir. July 13, 2015).

[99] *David*, 704 F.3d at 338.

No. 14-10553

was "left in a far less stable financial condition and underfunded by almost $2 billion or only about 66% actuarially funded."[100]

However, regardless of whether the plan is allegedly under- or over-funded, the direct injury to a participants' benefits is dependent on the realization of several additional risks, which collectively render the injury too speculative to support standing. In the first instance and as previously discussed, absent plan termination, the employer must cover any shortfall resulting from plan instability.[101] Pundt's allegation that the plan was underfunded, and less financially stable, merely increases the relative likelihood that Verizon will have to cover a shortfall. However, Pundt's allegations do not further allege the realization of risks which would create a likelihood of direct injury to participants' benefits. To wit, Pundt does not allege a plan termination, an inability by Verizon address a shortfall in the event of a termination, or a direct effect thereof on participants' benefits; on the contrary, Appellants concede on appeal that the actuarial underfunding resulted in no direct injury to Pundt.

Pundt also asserts that he directly suffered constitutionally cognizable injury through invasion of his statutorily created right, specifically that the alleged fiduciary breach from the mismanagement of Plan assets constitutes an invasion of his statutory rights to proper Plan management, and invokes principles of disgorgement. In *David v. Alphin*, however, the Fourth Circuit rejected a similar argument as conflating the concepts of statutory and constitutional standing.[102] We agree with the Fourth Circuit's reasoning in this regard. Article III standing is distinct from statutory standing, and we decline to undermine this distinction by recognizing the latter as conferring the

---

[100] ROA.1386.

[101] *See Hughes Aircraft Co. v. Jacobson*, 525 U.S. 432, 439 (1999).

[102] *See David*, 704 F.3d at 338.

33

No. 14-10553

former. Though the Supreme Court in *Lujan v. Defenders of Wildlife* allowed that the invasion of statutory rights might create standing, *Lujan* addressed constitutional standing arising from *de facto* injury, which is not alleged by a breach of fiduciary duty.[103] Importantly, the *Lujan* Court clarified that a legislative creation of rights does not eliminate the injury requirement for a party seeking review.[104] Accordingly, at least with regard to a direct injury to Pundt as a class representative, we conclude that the allegations are insufficient to support his standing to assert this claim.

*Harm to Plan as Injury-in-Fact.* While the alleged fiduciary misconduct is thus too attenuated to suffice as direct injury to Pundt, Appellants alternatively assert that the injury to the Plan itself is sufficient because Pundt is statutorily authorized to assert the claim on behalf of the Plan.

In support of his argument that a direct-benefit plan participant may bring suit on behalf of the plan, Appellants quote (without attribution) the Supreme Court's discussion in *Sprint Communications Co., L.P. v. APCC Services, Inc.*, of the various examples where courts permit suit for the benefit of parties that are not themselves bringing suit.[105] The *Sprint* Court held that an assignee for collection has Article III standing, even where the recovered proceeds of the claim are promised to the assignor, and even though the assignee did not originally suffer any injury.[106] Supporting the proposition that "the assignee of a claim has standing to assert the injury in fact suffered by the assignor," the *Sprint* Court cited to *Vermont Agency of Natural Resources v.*

---

[103] 504 U.S. 555, 577–78 (1992).

[104] *See id.* at 578.

[105] 554 U.S. 269, 287–88 (2008) (noting that "federal courts routinely entertain suits which will result in relief for parties that are not themselves directly bringing suit. Trustees bring suits to benefit their trusts; guardians ad litem bring suits to benefit their wards; receivers bring suit to benefit their receiverships; assignees in bankruptcy bring suit to benefit bankrupt estates; executors bring suit to benefit testator estates; and so forth.").

[106] 554 U.S. at 285–87.

No. 14-10553

*United States ex rel. Stevens.*[107] In *Vermont Agency*, the Court held that a relator had Article III standing to bring a *qui tam* action because, through the government's partial assignment its claim for damages, the government had conferred its injury in fact to the relator.[108] In both *Sprint* and *Vermont Agency*, the Court found that the petitioners had standing based on the history and precedent permitting assignees to maintain suit.[109]

In light of this precedent, Appellants posit that Plan participants may bring suit in a quasi-representative capacity, satisfying Article III's injury-in-fact requirement via an injury to the Plan. However, we decline to adopt this position because both *Sprint* and *Vermont Agency* are distinguishable in critical respects. First, those cases involved assignment between the parties, while here the Plan and Plan participants have no such relationship, and the Appellants do not argue that ERISA effects such an assignment (as did the statute in *Vermont Agency*). Since the Court's reasoning in both cases was firmly grounded on the history and tradition of assignment relationships, applying that reasoning to a circumstance in which no such relationship existed is speculative.

Second and even more significant, *Sprint* and *Vermont Agency* both involved the assignor as the injured party. Here, on the other hand, Appellants seek standing based on statutory authorization by an uninjured government, to seek redress by one private party of the injury to another private party. As the Eighth Circuit noted regarding similar circumstances, extending *Sprint* in such a way raises "serious constitutional concerns," because "[i]f Congress could assign an ERISA plan's claim to a participant who is not injured, . . . then what principled reason would preclude Congress from assigning the claim to

---

[107] 529 U.S. 765 (2000).
[108] *See id.* at 773.
[109] *See Sprint*, 554 U.S. at 285–86.

No. 14-10553

any stranger?"[110] Collectively, the facts and reasoning of *Sprint* and *Vermont Agency* allow a practical answer to this question, permitting Congress to satisfy the injury-in-fact by statutory assignment, yet only when the government is the injured party. Bearing in mind that "[i]n no event . . . may Congress abrogate Article III minima," we decline to otherwise construe and expand the reasoning of *Sprint*.[111]

For those reasons, we find no error the district court's dismissing the claim of the Non-Transferee Class for lack of subject matter jurisdiction.

## III.   CONCLUSION

For the foregoing reasons, we AFFIRM the judgment of the district court.



**Certified as a true copy and issued
as the mandate on Sep 15, 2016**

**Attest:** *Jyle W. Cayce*

**Clerk, U.S. Court of Appeals, Fifth Circuit**

---

[110] *McCullough v. AEGON USA Inc.*, 585 F.3d 1082, 1086 (8th Cir. 2009).
[111] *Gladstone Realtors v. Village of Bellwood*, 441 U.S. 91, 100 (1979).

# *United States Court of Appeals*
**FIFTH CIRCUIT**
**OFFICE OF THE CLERK**

**LYLE W. CAYCE**
**CLERK**

**TEL. 504-310-7700**
**600 S. MAESTRI PLACE**
**NEW ORLEANS, LA 70130**

September 15, 2016

Ms. Karen S. Mitchell
Northern District of Texas, Dallas
United States District Court
1100 Commerce Street
Earle Cabell Federal Building
Room 1452
Dallas, TX 75242

          No. 14-10553   William Lee, et al v. Verizon
                         Communications, Inc., et al
                         USDC No. 3:12-CV-4834

Dear Ms. Mitchell,

Enclosed is a certified copy of an opinion-order entered on
September 15, 2016.  We have closed the case in this court.

We are not forwarding the record on appeal as it is an electronic
copy.

                         Sincerely,

                         LYLE W. CAYCE, Clerk

                         By: _____
                         Joseph M. Armato, Deputy Clerk

Enclosure(s)

cc:
        Mr. Thomas Leon Cubbage III
        Mr. Robert E. Goodman Jr.
        Ms. Karen L. Handorf
        Mr. Jeffrey George Huvelle
        Mr. Curtis L. Kennedy
        Mr. Christian James Pistilli
        Ms. Michelle C. Yau